Filed 4/22/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNITED TALENT AGENCY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>VIGILANT INSURANCE COMPANY et al.,<br><br>Defendants and Respondents. | B314242<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV43745 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher K. Lui, Judge. Affirmed.

Pasich, Michael S. Gehrt, Kirk Pasich, Nathan M. Davis and Caitlin S. Oswald for Plaintiff and Appellant.

Clyde & Co, Susan Koehler Sullivan, Douglas J. Collodel, Gretchen S. Carner, Brett C. Safford; O'Melveny & Myers, Jonathan D. Hacker for Defendants and Respondents.

## INTRODUCTION

Appellant United Talent Agency (UTA) sued Vigilant Insurance Company and Federal Insurance Company, alleging that the insurers wrongfully denied property insurance coverage for economic losses related to the COVID-19 pandemic. The insurance policies covered "direct physical loss or damage" to insured property. UTA asserted that the policies covered its losses under two theories: first, loss of use of its properties due to civil closure orders and other limitations imposed to slow the spread of the virus, such as cancelled events and productions; and second, "damage" to its properties caused by the alleged presence of the virus in the air and on surfaces. The trial court sustained the insurers' demurrer without leave to amend, and UTA appealed.

We find that UTA has failed to allege facts sufficient to demonstrate direct physical loss or damage under either theory, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.      UTA and the insurance policies

UTA is a large talent agency that represents actors, directors, producers, recording artists, writers, and other professionals in industries such as film, television, music, digital media, and publishing. It purchased property insurance policies

---

[1] The first amended complaint and demurrer to the first amended complaint are at issue in this appeal, so we focus on the facts alleged in that version of the complaint.

from Vigilant and Federal that covered UTA premises in several states, including California, New York, Tennessee, and Florida.[2]

As relevant here, the policies included "business income and extra expense" provisions and a "civil authority" provision. The business income and extra expense provisions addressed business income loss and extra expenses incurred due to "impairment of . . . operations," if the impairment was "caused by or result[ed] from direct physical loss or damage by a covered peril to property." The "direct physical loss or damage must . . . occur at, or within 1,000 feet of" a covered premises. The provisions covered losses "during the period of restoration," defined as beginning "immediately after the time of direct physical loss or damage by a covered peril to property," and continuing until "operations are restored," including "the time required to . . . repair or replace the property." Covered premises included "dependent business premises," which were "premises operated by others" upon which the insured depends to do things such as "deliver materials or services" or "attract customers." The parties agree that "direct physical loss or damage" is not defined in the policies.

The civil authority provision covered income loss or expenses incurred "due to the actual impairment of . . . operations, directly caused by the prohibition of access to" covered premises "by a civil authority." The "prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property away from" covered premises,

---

[2] The Vigilant policy was effective from March 18, 2019 to March 18, 2020, and the Federal policy was effective from March 18, 2020 to March 18, 2021.

3

"provided such property is within one mile" of the covered premises.

## B. Complaint

In early 2020, the COVID-19 global pandemic, caused by the SARS-CoV-2 virus, began to affect the United States. State and local civil authorities issued "shelter in place" and "stay at home" orders, requiring suspension of non-essential businesses.[3]

UTA filed a complaint against the insurers on November 13, 2020, and filed a first amended complaint (FAC) on April 7, 2021.[4] UTA alleged that the closure orders and the virus itself "impaired UTA's ability to use . . . its insured locations . . . for their intended uses and purposes. As a result, UTA has suffered, and continues to suffer, substantial financial losses, including lost profits, lost commissions, and lost business opportunities. Additionally, UTA suffered losses as a result of cancelled live events, as well as cancelled television and motion picture productions." UTA alleged that "[a]t least 13 UTA employees, five spouses, and some of their dependents have tested positive for COVID-19." It asserted, "UTA currently estimates that its financial losses, including lost profits, lost commissions, and lost business opportunities, approximate $150,000,000, and are continuing."

---

[3] The insurers filed an unopposed request for judicial notice of four such closure orders: State of New York Executive Order No. 202 (Mar. 7, 2020); State of California Executive Order N-25-20 (Mar. 12, 2020); City of New York Emergency Executive Order (Mar. 16, 2020); and City of Los Angeles "Safer at Home" Order (Mar. 19, 2020, rev. Apr. 1, 2020). We granted the request.

[4] The court sustained the insurers' demurrer to the original complaint and granted UTA leave to amend.

4

UTA alleged that it sought coverage from the insurers for its losses, and the insurers wrongfully denied coverage. UTA stated that Vigilant, Federal, and other insurers in the Chubb group "adopted a universal practice of denying coverage for all business interruption claims associated with SARS-CoV-2, COVID-19, and subsequent events." UTA asserted that there was "no merit to Vigilant's and Federal's position that their policies do not insure the losses that UTA has suffered and is suffering."

UTA asserted two theories for why the insurers' denial was erroneous. First, UTA alleged loss of use of its properties. It alleged that "[t]he Closure Orders prohibited or limited the use and operations of UTA's insured locations and the premises upon which it relies. This meant that UTA (and many other businesses) could not use their insured locations and properties for their intended purpose." UTA also alleged that the closure orders "prohibited access to venues and locations hosting live events, all of which UTA depends on to deliver and/or accept services." UTA further asserted, "the presence or potential presence of SARS-CoV-2 at, on, and in insured property prevents or impairs the use of the property, thus constituting 'direct physical loss' to property as that phrase is used in the Policies, even if it did not constitute 'damage' to property as that term is used in the Policies."

Second, UTA asserted that the presence of the virus itself could constitute physical damage. UTA alleged that it was "informed and believes, and on that basis alleges, that SARS-CoV-2 has been present in the vicinity of and on and in its [insured] properties, or would have been present but for [UTA's] efforts to reduce, prevent, or otherwise mitigate its presence" and

"had the Closure Orders not been issued."  UTA alleged when "an infected person breathes, speaks, coughs, or sneezes," the virus permeates the air, settles on surfaces, and also "remain[s] airborne for a time sufficient to travel a considerable distance, filling indoor and outdoor spaces, and lingering in, attaching to, and spreading through heating, ventilation, and air conditioning ('HVAC') systems."  In addition, "[s]tudies suggest that SARS-CoV-2 can remain contagious on some surfaces for at least 28 days."  Thus, "respiratory droplets . . . expelled from infected individuals land on and adhere to surfaces and objects. In doing so, they physically change the property by becoming a part of its surface.  This physical alteration makes physical contact with those previously safe, inert surfaces (e.g., handrails, doorknobs, bathroom fixtures) unsafe.  When SARS-CoV-2 attaches or binds to surfaces and objects, it converts those surfaces and objects to active fomites, which constitutes physical loss and damage."[5]  UTA alleged, "Just like invisible smoke in air alters the air, the presence of the SARS- CoV-2 virus *alters* the air and airspace in which it is found and the property on which it lands.  This physical change constitutes physical loss and damage."  UTA asserted that "SARS-CoV-2 is no different from mold, asbestos, mudslides, smoke, oil spills, or other similar elements that cause property damage, although they later might be removed, cleaned, or remediated."

---

[5] Merriam-Webster defines "fomite" as "an object . . . that may be contaminated with infectious agents (such as bacteria or viruses) and serve in their transmission."  Merriam Webster Dictionary <https://www.merriam-webster.com/dictionary/formite > [as of April 4, 2022] archived at **<https://perma.cc/6KRT-BUU4>.)**

6

UTA alleged causes of action for breach of contract against Vigilant, breach of the implied covenant of good faith and fair dealing against Vigilant, and declaratory relief against both insurers and Doe defendants.

## C. Demurrer

The insurers demurred to the FAC, asserting that UTA failed to state facts sufficient to constitute a viable cause of action.[6] (Code Civ. Proc., § 430.10, subd. (e).) The insurers asserted that each of UTA's causes of action was "premised on an obligation to pay policy benefits due, but [UTA] has not alleged and cannot allege a covered loss in the first instance, as a matter of law."

The insurers asserted that the relevant policies insured impairment of operations "caused by or result[ing] from direct physical loss or damage by a covered peril to property," and "[t]he Extra Expense[ ] and Building and Personal Property[ ] coverages likewise require 'direct physical loss or damage.'" They argued that under California law, the phrase "direct physical loss" required an "actual change in [the] insured property," or a "distinct, demonstrable, physical alteration" of the property. The insurers asserted that neither the temporary limitations placed on the use of properties by the closure orders nor the alleged presence of the virus at UTA's covered properties constituted "direct physical loss or damage." The insurers also argued that "the FAC does not even contain factual allegations that [the virus] was actually present," and even if UTA could make such an

---

[6] UTA did not include the demurrer, opposition, or reply in its appellant's appendix on appeal. The insurers included the demurrer in their respondent's appendix, but not the opposition or reply. We summarize here the limited record presented to us.

7

allegation, "the virus harms human beings, not property." The insurers asserted that the presence of the virus could not constitute a "direct physical loss or damage" as a matter of law.

The insurers further asserted that coverage was limited to a "period of restoration" as property was being repaired or replaced—a situation that did not apply here, because there was no physical damage to the property. They also argued that restrictions on use arising from the closure orders did not constitute physical loss or damage, and civil orders to avoid gathering in groups did not constitute property damage. In addition, the "civil authority" coverage did not apply because UTA "failed to identify physical loss or damage to a property within one mile of an insured" premises. The insurers noted that many cases throughout the country had rejected claims similar to UTA's.

## D.    Ruling

Following a hearing, the court issued a 19-page written ruling sustaining the demurrer without leave to amend. The court noted that UTA did not allege "that it knows for certain that the SARS-CoV-2 virus was even present on its property." The court observed that the presence of contaminants such as asbestos, mold, or oil spills typically would need to be confirmed before coverage would be found. The court stated that UTA's "failure to allege that it affirmatively detected the presence of active/viable SARS-CoV-2 in or on its property, or other property away from the premises distinguishes SARS-CoV-2 from all of the (mostly non-California) cases cited" in the FAC. Without pleading that the alleged contaminant was actually on UTA's property, UTA's claim was "inherently speculative."

8

The court noted that "[a]lthough there [do] not appear to be any state law decisions to date, recent federal district court decisions[ ] have interpreted California law as requiring a tangible, distinct, demonstrable, physical alteration of the property, which is not accomplished by the presence of COVID-19 on insured property." The court observed that "UTA's Complaint does not allege that the presence of coronavirus on or at [UTA's] (as yet unidentified) property so altered the property that it must be repaired or replaced, nor that UTA lost the ability to control or possess the property itself." The court continued, "Nor does [UTA] plead that remediation of the property is required, thereby triggering the period of restoration referred to in the Business Income With Extra Expense coverage. That period commences with the 'physical loss or damage' and 'continue[s] until your operations are restored,'" including the time needed to "'repair or replace the property.'"

The court also found that the civil authority coverage was not applicable because under the policies, "the civil authority order cannot *itself* cause the 'physical loss or damage to property,' which is the theory underlying [UTC's FAC]. Rather, the 'physical loss or damage to property' *precedes and necessitates* the issuance of the civil authority [order]." The court stated that any loss incurred as a result of the closure orders "was not a physical deprivation of property, but rather an interruption of business operations."

The court therefore sustained the demurrer to each cause of action without leave to amend, ordered the case dismissed with prejudice, and entered judgment in favor of the insurers. UTA timely appealed.

**DISCUSSION**

**A.     Legal standards**

"Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend.  [Citation.]  We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.)  A judgment or order of the lower court is presumed to be correct, and the appellant has the burden of affirmatively showing error.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

This case calls for the interpretation of the Vigilant and Federal insurance policies.  "The principles governing the interpretation of insurance policies in California are well settled.  'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.)  "If contractual language is clear and explicit, it governs."  (*Bank of the West*, at p. 1264; see Civ. Code, § 1638.)  If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'"  (*Bank of the West*, at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [(*AIU*)].)  "'Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.'"  (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

"[I]n cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler, supra*, 49 Cal.4th at p. 322.) "The policy must be examined as a whole, and in context, to determine whether an ambiguity exists." (*Id.* at p. 322.)

UTA asserts two theories for why its losses were covered under the business expense provisions. First, UTA contends that the "danger posed by" the virus, which gave rise to the closure orders and other restrictions, caused "physical loss" because it "limited UTA's use of and operations at its insured locations," including dependent business premises, such as concert venues, thus "rendering them unusable for their intended purposes." Second, UTA asserts that the virus itself in or around UTA's insured locations caused "physical damage." UTA further asserts that it was entitled to coverage under the civil authority provision. We consider each of these contentions.

## B. Business income and extra expense provisions

### 1. *Loss of use*

UTA acknowledges that coverage under the business expense provisions requires "direct physical loss or damage" to its insured premises. It alleges that "the danger posed by SARS-CoV-2 causes 'physical loss." UTA states that California law recognizes that "'physical loss' can occur if a property is inherently dangerous and cannot be used," and "when a dangerous condition renders property unusable, there is a covered loss under 'all-risks' policies." The insurers assert that a

11

"loss of economic use of property, absent tangible alteration to the property, does not constitute 'direct physical loss or damage."

"[T]he threshold requirement for recovery under a contract of property insurance is that the insured property has sustained physical loss or damage." (*Simon Marketing, Inc. v. Gulf Ins. Co.* (2007) 149 Cal.App.4th 616, 623 (*Simon Marketing*).) "Case law establishes that when an insurance policy uses the phrase 'direct physical loss of or damage to . . . [p]roperty,' 'the words "direct physical" . . . modify both "loss of" and "damage to."' [Citation.] Accordingly, [an insured] must establish that *either* 'direct physical . . . damage to' property at the premises, *or* 'direct physical loss of' property at the premises caused its suspension of operations." (*Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688, 699 (*Inns-by-the-Sea*).) "A direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" (*MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 779 (*MRI Healthcare*).) Thus, "[f]or there to be a 'loss' within the meaning of the policy, some external force must have acted upon the insured property to cause a physical change in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term." (*Id.* at p. 780.)

In the wake of the COVID-19 pandemic, many insureds have asserted arguments similar to UTA's, and the majority of courts have rejected them. It is now widely established that temporary loss of *use* of a property due to pandemic-related closure orders, without more, does not constitute direct physical

12

loss or damage.  Our colleagues in the Fourth District, Division
One addressed this issue in *Inns-by-the-Sea*, *supra*, 71
Cal.App.5th 688.  There, the plaintiff, Inns, had property
insurance coverage with the defendant insurer.  Inns alleged that
the presence of the COVID-19 virus on its premises "'constitutes
the requisite "damage," as that undefined term is reasonably
understood, because its physical presence transforms property,
specifically indoor air and surfaces, from a safe condition to a
dangerous and potentially deadly condition unsafe and unfit for
its intended purpose.'" (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at
p. 699.)  The trial court sustained the defendant's demurrer, and
the Court of Appeal affirmed.[7]

The appellate court relied in part on the Couch on
Insurance treatise, noting that typically the "'threshold' of
establishing 'physical loss or damage' 'has been met when an
item of tangible property has been physically altered by perils
like fire or water.'" (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p.
700, quoting 10A Couch on Insurance (3d ed. 2016) § 148:46, p.
148-95 (Couch).)  "'When the structure of the property itself is
unchanged to the naked eye, however, and the insured alleges
that its usefulness for its normal purposes has been destroyed or
reduced, there are serious questions whether the alleged loss
satisfies the policy trigger.'" (*Inns-by-the-Sea, supra*, 71
Cal.App.5th at p. 700, quoting Couch*, supra*, p. 148-95.)  The
court noted, however, that in such cases, there may be "property
damage within the meaning of a property insurance policy

---

[7] Following oral argument in this case, our colleagues in
Division One followed *Inns-by-the-Sea* in *Musso & Frank Grill
Co. v. Mitsui Sumitomo Insurance USA, Inc.* (Apr. 21, 2022
B310499) __ Cal.App.5th __.

13

despite the absence of physical alteration of a structure or object" if the property becomes "uninhabitable and unavailable for its intended use." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 701.) In this way, the COVID-19 virus could be compared to situations in which "smoke, ammonia, odor, or asbestos" constituted physical loss or damage that rendered a property unusable. (*Id.* at p. 703.)

However, the court found that Inns "cannot reasonably allege that the presence of the COVID-19 virus on its premises is what *caused* the premises to be uninhabitable or unsuitable for their intended purpose." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 703.) Rather, Inns "alleges that it ceased operations 'as a direct and proximate result of the Closure Orders [issued by civil authorities].' It does not make the proximate cause allegation based on the particular presence of the virus on its premises." (*Ibid.*) Thus, "'all that is required for Plaintiff to return to full working order is for the [government orders and restrictions to be lifted].'" (*Id.* at p. 704, quoting *First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.* (W.D.Wash., July 22, 2021, No. 2:21-cv-00344-BJR) 2021 WL 3109724, at p. *4 [alteration in *Inns-by-the-Sea*].) The court noted that even if Inns had eradicated the virus by thoroughly sterilizing its properties, "Inns would *still* have continued to incur a suspension of operations because the Orders would *still* have been in effect and the normal functioning of society *still* would have been curtailed." (*Id.* at p. 704.)

*Inns-by-the-Sea* also noted that "[t]he overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income [citations], along with each federal appellate court to consider the issue." (*Inns-by-the-*

14

*Sea, supra,* 71 Cal.App.5th at p. 692, fn. 1.) The Sixth Circuit recently reached a similar conclusion, and noted that the "Second, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits, examining the common meaning of the word 'loss' and applying state law to similar insurance policies, have all ruled similarly." (*Brown Jug, Inc. v. Cincinnati Ins. Co.* (6th Cir. 2022) 27 F.4th 398, 402, (*Brown Jug*) collecting federal cases; see also *Uncork and Create LLC v. Cincinnati Ins. Co.* (4th Cir., 2022) 27 F.4th 926, 933-934, collecting federal cases.)[8]

The Ninth Circuit, applying California law, rejected a similar claim by an insured corporation and retail store, Mudpie. (*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America* (9th Cir. 2021) 15 F.4th 885, 887 (*Mudpie*).) Mudpie claimed coverage under the defendant insurer's business income and extra expense coverage "after state and local authorities in California issued several public health orders in response to the COVID-19 pandemic." (*Id*. at p. 888.) The Ninth Circuit rejected Mudpie's assertion that it suffered "'direct physical loss of or damage'" to covered property as a result of its inability to operate its business due to the closure orders. (*Id*. at p. 892.) The Ninth Circuit determined that "California courts would construe the phrase 'physical loss of or damage to' as requiring an insured to allege physical alteration of its property," not simply economic loss. (*Ibid*.)

---

[8] A website administered by the University of Pennsylvania Law School titled "Covid Coverage Litigation Tracker" tracks rulings in insurance coverage litigation arising from the pandemic. (<See https://cclt.law.upenn.edu/> [as of April 4, 2022] archived at < **https://perma.cc/KTJ7-Z2HJ>.)**

UTA acknowledges the holdings of *Inns-by-the-Sea* and similar cases that follow the Couch treatise in holding that "physical loss" involves a "distinct, demonstrable, physical alteration of the property." However, UTA asserts these cases and the Couch treatise are wrong in that Couch rejected the majority position, adopted the minority position, and now, "[f]or nearly a quarter of a century, Couch's misstatement has snowballed as a self-fulfilling prophesy."

UTA further argues that in contrast to Couch, "California courts have a long history of recognizing that 'physical loss' can occur if a property is inherently dangerous and cannot be used." It cites *Hughes v. Potomac Ins. Co. of District of Columbia* (1962) 199 Cal.App.2d 239 (*Hughes*) and *Strickland v. Federal Ins. Co.* (1988) 200 Cal.App.3d 792 (*Strickland*), which both considered the extent to which homeowners' insurance policies covered homes that became unstable due to landslides. In *Hughes*, a nearby creek washed out a portion of the ground supporting the house, leaving it "standing on the edge of and partially overhanging a newly-formed 30-foot cliff." (*Hughes, supra,* 199 Cal.App.2d at p. 243.) In *Strickland*, the home was built on unstable, shifting ground, which caused ongoing structural issues, although the house was not uninhabitable. (*Strickland, supra*, 200 Cal.App.3d at pp. 794-796.) However, the issue in these cases was not loss of use of otherwise undamaged property. To the contrary, the undermined ground beneath both houses placed the structures at serious risk. Moreover, the risk was inextricably linked to the insured property.

By contrast, the losses here arose from closures intended to limit the spread of a virus that can carry great risk to people but no risk at all to a physical structure. As the trial court observed

16

in sustaining the demurrer, UTA's alleged loss "was not a physical deprivation of property, but rather an interruption in business operations."  The closure orders and other measures imposed in an effort to reduce the spread of the virus among people had little relationship to any particular location; rather, they were intended to reduce people's proximity to and interaction with one another, thereby reducing the risk that an infected person could infect others.  We therefore decline UTA's invitation to depart from the Couch treatise and the case law that relies upon it.  (See, e.g., *Simon Marketing, supra,* 149 Cal.App.4th at p. 623; *MRI Healthcare, supra,* 187 Cal.App.4th at p. 779; *Doyle v. Fireman's Fund Ins. Co.* (2018) 21 Cal.App.5th 33, 38.)

In addition, the "period of restoration" language in the policies demonstrates that coverage requires a physical loss requiring repair or replacement, not simply loss of use.  The policies covered "actual or potential impairment of . . . operations" "during the period of restoration," defined as beginning "immediately after the time of direct physical loss or damage by a covered peril to property," and continuing until "operations are restored," including "the time required to . . . repair or replace the property."  Reviewing a similar policy, *Inns-by-the-Sea* stated, "The Policy's focus on repairing, rebuilding or replacing property (or moving entirely to a new location) is significant because it implies that the 'loss' or 'damage' that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed, or if incapable of being physically fixed because it is so heavily destroyed, requires a complete move to a new location." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 707.)  Thus, "[t]he definition of 'period of restoration' provides an indication that the

phrase 'direct physical loss of' property was not intended to include the mere loss of use of physical property to generate income, without any other physical impact to property that could be repaired, rebuilt or replaced." (*Id.* at p. 708.) Several other courts have reached similar conclusions. (See, e.g., *Mudpie, supra*, 15 F.4th at p. 892 ["To interpret the Policy to provide coverage absent physical damage would render the 'period of restoration' clause superfluous"]; *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.* (7th Cir. 2021) 20 F.4th 327, 333 (*Sandy Point Dental*); *Santo's Italian Cafe LLC v. Acuity Ins. Co.* (6th Cir. 2021) 15 F.4th 398, 403 (*Santo's*); *Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co.* (10th Cir. 2021) 21 F.4th 704, 711; *Indiana Repertory Theatre v. Cincinnati Casualty Co.* (Ind. Ct. App. 2022) 180 N.E.3d 403, 410.)

We therefore follow the reasoning of *Inns-by-the-Sea* and similar cases in acknowledging "the generally recognized principle in the context of first party property insurance that mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at pp. 705-706.) UTA's allegations of loss of use of insured premises and dependent premises due to the closure orders and other pandemic-related limitations are insufficient to establish "direct physical loss or damage" entitling UTA to coverage under the relevant policies. We therefore turn to UTA's contention that the presence of the virus itself constituted physical damage.

2. *Presence of the virus as physical damage*

UTA argues that its allegations are different than those in *Inns-by-the-Sea*, *Mudpie*, and other cases in that UTA alleged not

only loss of use, but also that the physical presence of the virus on UTA's insured premises constituted "physical damage." UTA asserts that its allegations are therefore more akin to cases that "have recognized that 'direct physical loss or damage to property' occurs" in the presence of contaminants such as bacteria, smoke, asbestos, fumes, or mold. The insurers assert that the presence of the virus cannot constitute physical damage as a matter of law.[9]

The FAC includes extensive allegations about how the virus spreads from one person to another, including in "[a]erosolized droplets exhaled" by an infected person traveling through the air, and "fomite transmission" from touching surfaces contaminated with the virus. UTA alleged the virus damages property by "physically permeating" and binding to" the property, and "aerosolized droplet nuclei. . . , like toxic fumes, make the premises unsafe." It alleged that the presence of the virus "causes physical loss and physical damage by requiring remedial measures to reduce or eliminate the presence of SARS-CoV-2, including extensive cleaning and disinfecting; installing, modifying, or replacing air filtration systems; remodeling and reconfiguring physical spaces; and other measures." UTA has not alleged that it was required to undertake any of these remedial measures.

---

[9] The insurers assert that UTA does not allege "concrete facts" sufficient to show that the virus was actually present on UTA property, echoing the finding by the superior court. We do not address this contention, because even if UTA adequately alleged the virus was present on its property, it has not sufficiently alleged direct property loss or damage as a result.

Many courts have rejected the theory that the presence of the virus constitutes physical loss or damage to property. As the Seventh Circuit stated in rejecting a similar claim, "While the impact of the virus on the world . . . can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days." (*Sandy Point Dental, supra,* 20 F.4th at p. 335.) Or as the United States District Court, Southern District of California stated, "If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result." (*Unmasked Management, Inc. v. Century-National Ins. Co.* (S.D. Cal. 2021) 514 F.Supp.3d 1217, 1226.) The majority of cases in California (and elsewhere) are in accord.[10]

_____

[10] (See, e.g., *Pappy's Barber Shops, Inc. v. Farmers Group, Inc.* (S.D. Cal. 2020) 491 F.Supp.3d 738, 740 (*Pappy's Barber Shops*) ["the presence of the virus itself, or of individuals infected the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property"]; *Wellness Eatery La Jolla LLC v. Hanover Ins. Group* (S.D. Cal. 2021) 517 F.Supp.3d 1096, 1106 ["the Court does not find that the presence of COVID-19 qualifies as physical damage to property because the virus harms human beings, not property"]; *Kevin Barry Fine Art Associates v. Sentinel Ins. Co., Ltd.* (N.D. Cal. 2021) 513 F.Supp.3d 1163, 1171 ["Even if KBFA had included allegations regarding the virus being present on and damaging the property, they would not be plausible. [Citations.] . . . The virus COVID-19 harms people, not property."]; *Barbizon School of San Francisco, Inc. v. Sentinel Ins. Co. Ltd.* (N.D. Cal. 2021)

As *Inns-by-the-Sea* noted, there are "some comparable elements between" allegations that the virus physically altered property and cases in which "a physical force rendered real property uninhabitable or unsuitable for its intended use, without any structural alteration," because "the COVID-19 virus—like smoke, ammonia, odor, or asbestos—is a physical force." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 703.) However, *Inns-by-the-Sea* also stated that courts have rejected claims that "short lived" contamination that can be addressed by simple cleaning constitutes direct physical loss. (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 703, fn. 17.) *Inns-by-the-Sea* discussed *Mama Jo's Inc. v. Sparta Ins. Co.* (11th Cir. 2020) 823 Fed.Appx. 868 (*Mama Jo's*), a case involving construction-related dust, which required only "cleaning and painting," and "no need for removal or replacement of items." (*Mama Jo's*, 823 Fed.Appx. at p. 879.) The court stated that "under Florida law, an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'" (*Ibid*.) *Inns-by-the-Sea* also cited *Kim-Chee LLC v. Philadelphia Indemnity Ins. Co.* (W.D.N.Y. 2021) 535 F.Supp.3d 152, 161, in which the court noted that "contamination that is temporary . . . is unlikely to

530 F.Supp.3d 879, 890-891 (*Barbizon School*) [no physical loss or damage to property for "a virus, which 'can be disinfected and cleaned' from surfaces"]; but see *Los Angeles Lakers, Inc. v. Federal Ins. Co.* (C.D. Cal., Mar. 17, 2022, No. CV 21-02281 TJH (MRWx) -- F.Supp.3d --; 2022 WL 831549, at *3 [allegation "that the Virus physically altered surfaces at the Covered Properties" was sufficient to state a claim for "declaratory judgment and breach of contract as to the Policy's Property Damage Clause"].)

qualify as a direct physical loss to the insured premises." The Second Circuit has since affirmed that ruling, stating, "Even assuming the virus's presence at Kim-Chee's tae-kwon-do studio, the complaint does not allege that any part of its building or anything within it was damaged—let alone to the point of repair, replacement, or total loss. . . . [W]e agree with the district court that the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under Kim-Chee's policy." (*Kim-Chee LLC v. Philadelphia Indemnity Ins. Co.* (2d Cir., Jan. 28, 2022, No. 21-1082-CV) 2022 WL 258569, at *2.)

UTA compares this case to *AIU, supra,* 51 Cal.3d 807, and *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 (*Armstrong*), asserting that "*AIU* and *Armstrong* are controlling pronouncements of California insurance law, holding that the presence of contaminants and other hazardous materials cause physical damage to property."

*AIU* and *Armstrong* both considered whether comprehensive general liability (CGL) policies covered property damage presumed to have been caused by the insured. In *AIU*, the insured, FMC, was sued in an underlying action "for the contamination of 79 different hazardous waste disposal sites, groundwater beneath the sites, aquifers beneath adjoining property, and surrounding surface waters." (*AIU, supra,* 51 Cal.3d at p. 815.) FMC then sought "declaratory relief establishing that the CGL policies cover costs it may become obligated to pay as a result of injunctive relief and/or reimbursement ordered in the third party suits." (*Id.* at p. 816.) When the declaratory relief action reached the Supreme Court,

22

the court considered in part whether FMC's "costs will be incurred because of 'property damage.'" (*Id*. at p. 818.) The court held that "[c]ontamination of the environment" constituted property damage, and "reimbursement of response costs and the costs of injunctive relief under CERCLA[11] and related statutes are incurred 'because of' property damage." (*Id*. at p. 842.) The court noted that there would be no coverage for "prophylactic costs—incurred to pay for measures taken in advance of any release of hazardous waste," but "because the agencies in this suit allege that the waste sites themselves and water on and surrounding the sites have already been contaminated by hazardous waste . . . the reimbursement and the costs of injunctive relief sought here at least in part constitute 'damages because of property damage.'" (*Id*. at p. 843.)

CGL coverage was also at issue in *Armstrong*, a declaratory relief action brought by the insured, Armstrong, which manufactured asbestos-containing building material (ACBM). (*Armstrong, supra,* 45 Cal.App.4th at pp. 87-88.) The court considered whether claims for damage caused by ACBM constituted "property damage" under the relevant CGL policies, which "obligate[d] the insurers to pay 'all sums which the insured shall become legally obligated to pay as damages because of . . . property . . . damage caused by an occurrence.'" (*Armstrong, supra,* 45 Cal.App.4th at p. 88.) The court held that if Armstrong were "held liable for the release of asbestos fibers, whatever the level of contamination, the injury is a physical injury covered by the insurance policies." (*Id*. at p. 91.) The court noted, "Once installed, the ACBM, whether in the form of insulating pipe

---

[11] CERCLA is the Comprehensive Environmental Response and Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

coverings, fireproof floor tile, accoustical [*sic*] ceiling finishes, or the like, is physically linked with or physically incorporated into the building and therefore physically affects tangible property." (*Ibid*.) The court also observed, "[B]ecause the potentially hazardous material is physically touching and linked with the building, and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply." (*Id*. at p. 92.)

UTA asserts that according to *AIU*, "the presence of environmental contaminants constitutes property damage," and "the asbestos fibers in *Armstrong* are directly analogous to the presence of SARS-CoV-2 here." UTA also argues that cases such as *Inns-by-the-Sea* addressing only loss of use are not relevant because by contrast, UTA has alleged that the virus's presence itself constituted a physical loss or damage, more like the contaminants in *AIU* and *Armstrong*.

However, cases involving CGL coverage are of limited benefit in determining the scope of property insurance coverage. "[T]he cause of loss in the context of property insurance is wholly different from that in a liability policy," and a liability insurer "agrees to cover the insured for a 'broader spectrum of risks' than in property insurance." (*MRI Healthcare, supra*, 187 Cal.App.4th at p. 779 fn. 6.) Indeed, *Inns-by-the-Sea* observed that "*Armstrong* is not a persuasive precedent (and we therefore do not discuss it), as it dealt with insurance coverage under a third party commercial general liability (CGL) policy with different policy language and posing distinct coverage issues." (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 701, fn. 16.)

Moreover, we agree with the majority of the cases finding that the presence or potential presence of the virus does not

24

constitute direct physical damage or loss.  While the infiltration of asbestos as in *Armstrong* or environmental contaminants as in *AIU* constituted property damage in that they rendered a property unfit for a certain use or required specialized remediation, the comparison to a ubiquitous virus transmissible among people and untethered to any property is not apt. Asbestos in installed building materials as in *Armstrong* and environmental contaminants as in *AIU* are necessarily tied to a location, and require specific remediation or containment to render them harmless.  Here, by contrast, the virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks.  Thus, the presence of the virus does not render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space.

UTA points to a hypothetical scenario mentioned in *Inns-by-the-Sea* in which remediation measures could plausibly constitute a loss: "[I]t could be possible, in a hypothetical scenario, that an invisible airborne agent would cause a policyholder to suspend operations because of direct physical damage to property. . . .  As one court explained, 'It could be a different story if a business—which could have otherwise been operating—had to shut down because of the presence of the virus within the facility.  For example, a restaurant might need to close for a week if someone in its kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period.  Perhaps the restaurant could

successfully allege that the virus created physical loss or damage in the same way some chemical contaminant might have.'" (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at pp. 704-705, quoting *Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (N.D.Cal., Feb. 25, 2021, No. 20-cv-07476-VC) 2021 WL 774141, at p. *2.) UTA asserts, "This is exactly what UTA has alleged: the presence of the virus, confirmed by its employees testing positive for COVID-19, and the resulting closure of facilities."[12]

However, a discussion of a hypothetical scenario is not a statement of California law, and UTA cites no other case suggesting that such a scenario demonstrates "direct physical loss or damage."[13] To the contrary, other courts have rejected similar claims. In the Sixth Circuit case *Brown Jug, supra,* 27

___

[12] This is a generous interpretation of UTA's allegations. Although UTA alleged that some employees and family members tested positive for COVID-19, it did not allege that they were infected at UTA property or present at UTA property while infected, nor did UTA allege that any facilities were closed as a direct result. UTA's actual allegation is much less precise: "At least 13 UTA employees, five spouses, and some of their dependents have tested positive for COVID-19. As a result of the threat presented by the actual or potential presence of SARS-CoV-2 and the Closure Orders, UTA suffered losses from cancelled live events . . . and cancelled television and motion picture productions."

[13] The Northern District's order quoted in *Inns-by-the-Sea* granted the insurer's motion to dismiss the insured's claim with leave to amend. (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (N.D.Cal., Feb. 25, 2021, No. 20-cv-07476-VC) 2021 WL 774141.) The court later dismissed the case with prejudice for failure to state a claim. (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (N.D. Cal., June 21, 2021, No. 20-CV-07476-VC) 2021 WL 2670743, app. pending, No. 21-16093 (9th Cir.).)

26

F.4th 398, for example, a plaintiff restaurant, Dino Drop, "alleges that several of its employees and customers tested positive for COVID-19, likely after exposure to the virus by a live band that played at one of its restaurants. This outbreak purportedly 'damaged' the property, because Dino Drop had to take remediation measures, such as cleaning and reconfiguring spaces, to reduce the threat of COVID-19." (*Id*. at p. 404.) The Sixth Circuit held that such a claim did not constitute property damage: "These, however, are precisely the sorts of losses we have previously determined are 'not tangible, physical losses, but economic losses.'" (*Ibid*., citing *Universal Image Productions, Inc. v. Federal Ins. Co*. (6th Cir. 2012) 475 Fed.Appx. 569, 571, 573 [moving and cleanup costs arising from mold and bacteria contamination constituted economic losses, not "physical loss"].)

Other courts have also held that cleaning or employing minor remediation or preventive measures to help limit the spread of the virus does not constitute direct property damage or loss. (See, e.g., *L&J Mattson's Co. v. Cincinnati Ins. Co., Inc.* (N.D. Ill. 2021) 536 F.Supp.3d 307, 315, fn.3 ["additions such as Plexiglas, hand sanitizer, air purifiers or improved HVAC systems do not constitute repairs to damaged property where a plaintiff has not alleged damage to property. Instead, those additions constitute improvements to stop the spread of virus from one person to another"]; *Cafe La Trova LLC v. Aspen Specialty Ins. Co.* (S.D. Fla. 2021) 519 F.Supp.3d 1167, 1182 ["Plaintiff's rearranging of furniture and installation of partitions cannot 'reasonably be described as repairing, rebuilding, or replacing'" and cannot constitute "the very 'damage' it now asserts is sufficient to invoke coverage"]); *Independence Restaurant Group v. Certain Underwriters at Lloyd's, London*

(E.D. Pa. 2021) 513 F.Supp.3d 525, 534-535 [moving equipment and adding plexiglass to make property "functional and reasonably safe for patrons" cannot reasonably be described as repairing, rebuilding, or replacing. "Neither can disinfecting or cleaning property that is contaminated."].)  Moreover, UTA has not alleged that its properties required unique abatement efforts to eradicate the virus.

UTA has not established that the presence of the virus constitutes physical damage to insured property.  We therefore turn to UTA's contention that it was entitled to coverage under the civil authority provision.

## C.    Civil authority provision

The policies' civil authority provision covers business income loss or extra expenses incurred "due to the actual impairment of . . . operations, directly caused by the prohibition of access to" covered premises "by a civil authority," as long as the prohibition of access is "the direct result of direct physical loss or damage to property away from" a covered premises, "provided such property is within one mile" of the covered premises.

UTA contends it was entitled to coverage under this provision because the closure orders prohibited access to its insured properties.  It asserts that the virus "physically alters tangible property," the closure orders were issued "due to the presence of SARS-CoV-2 throughout the country," and therefore the orders were issued "'due to' the direct physical loss and damage caused by SARS-CoV-2."  UTA also points out that the March 16, 2020 order issued by the mayor of New York City stated, in part, that "this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage," and the March

28

19, 2020 order issued by the mayor of Los Angeles stated that "the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."  The insurers respond that the closure orders were issued to curtail the spread of the virus, not because of physical loss or damage to property near UTA's insured premises.

We agree with the insurers, as well as the trial court's finding that "the civil authority order cannot *itself* cause the 'physical loss or damage to property,' which is the theory underlying [UTC's FAC].  Rather, the 'physical loss or damage to property' *precedes and necessitates* the issuance of the civil authority [order]."  Closure orders across the country were issued in response to the public health crisis arising from the pandemic, not as "the direct result of" damage to property near UTA's.  In addition, just as the presence of the virus does not constitute physical loss or damage to insured property, it also does not constitute physical loss or damage to property "away from" or within a mile of the covered property.  Neither the closure orders themselves nor UTA's allegations suggest the orders related to any property within one mile of UTA's covered premises.  Indeed, UTA has not alleged the locations of its covered premises, other than to say that its headquarters are in Beverly Hills (which, incidentally, is neither New York City nor the City of Los Angeles).

*Inns-by-the-Sea* rejected a similar argument, stating, "[T]he Orders make clear that they were issued in an attempt to prevent the spread of the COVID-19 virus.  The Orders give no indication that they were issued 'due to direct physical loss of or damage to' any property.  Therefore, the Orders did not give rise to Civil

29

Authority coverage." (*Inns-by-the-Sea, supra*, 71 Cal.App.5that pp. 711-712.) Again, cases arising in California and elsewhere are in accord. (See, e.g., *Barbizon School, supra,* 530 F.Supp.3d at p. 891 ["the government orders were issued to prevent the spread of COVID-19, not in response to property damage"]; *Pappy's Barber Shops, supra,* 487 F.Supp.3d at p. 945 ["Just as the complaint does not plausibly allege any direct physical loss of Plaintiff's property, it also does not allege any direct physical loss or damage to property not at Plaintiffs' places of business."]; *Brown Jug, supra,* 27 F.4th 398, 404 ["Plaintiffs have also failed to allege that COVID-19 caused loss or damage to properties 'other than the covered property' as required to plead a breach of the Civil Authority provision"]; *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.* (2d Cir. 2021) 21 F.4th 216, 223 ["the executive orders were the result of the COVID-19 pandemic and the harm it posed to human beings, not, as 'risk of direct physical loss' entails, risk of physical damage to property".)

UTA therefore has not alleged facts sufficient to state a cause of action for breach of the relevant insurance policies. In addition, a plaintiff that cannot state a cause of action for breach of contract cannot assert a claim for breach of the implied covenant of good faith and fair dealing. (*1231 Euclid Homeowners Assn. v. State Farm Fire & Casualty Co.* (2006) 135 Cal.App.4th 1008, 1021; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.) UTA does not seek to amend its complaint, or challenge the trial court's denial of leave to amend.

UTA argues that in the pandemic, "those who insure risk should suffer at least as much as everyone else," and rather than take responsibility for the losses suffered by insureds, insurers have "created an alternate universe, in which they bear no

30

responsibility for the worst losses imaginable." We are mindful that the human and financial toll of the pandemic has been staggering. However, insurance is not a general safety net for all occurrences; "courts must honor the coverage the parties did— and did not—provide for in their written contracts of insurance." (*Santo's, supra,* 15 F.4th at p. 407.) Here, UTA's property insurance policies did not cover losses attributable to a worldwide pandemic that did not cause physical loss or damage to any insured premises, even as the need for reduced human interaction affected UTA's ability to conduct its business. We therefore find no error in the court's ruling sustaining the insurers' demurrer.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

**CERTIFIED FOR PUBLICATION**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.

31