[Civ. No. 19605. First Dist., Div. Two. Jan. 18, 1962.]

WALTER R. HUGHES, JR., et al., Plaintiffs and Respondents, v. THE POTOMAC INSURANCE COMPANY OF THE DISTRICT OF COLUMBIA, Defendant and Appellant; THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant and Respondent.

242

Bert W. Levit, Victor B. Levit and Long & Levit for Defendant and Appellant.

Stephen McReavy, Lee H. Cliff and Hall, Henry, Oliver & McReavy for Respondents.

SHOEMAKER, J.—This is an appeal by defendant The Potomac Insurance Company of the District of Columbia, from a money judgment in favor of plaintiffs Walter R. Hughes, Jr. and Iris L. Hughes.

Plaintiffs, husband and wife, are the owners of a home in Walnut Creek, California, which they purchased in 1947. On October 1, 1956, defendant issued to plaintiffs an insurance policy wherein it insured plaintiffs against all risks of physical loss of and damage to their dwelling, appurtenant private structures, household and personal property on the premises, and further provided for additional living expenses caused by the loss of said dwelling. This policy excluded from coverage all losses caused by "surface waters, flood waters, waves, tide or tidal wave, high water, or overflow of streams or bodies of water, all whether driven by wind or not." The

policy further provided that trees, shrubs, lawns, and plants were insured only against certain risks not here relevant.

Plaintiffs' premises are bounded to the rear and on one side by Las Trampas Creek. When plaintiffs retired on the night of March 31, 1958, their home was 30 feet from the banks of the creek. Early on the morning of April 1, 1958, a shudder and shaking were heard and felt, and practically instantaneously the earth to the rear of and partially underlying plaintiffs' house slid into the creek, leaving their home standing on the edge of and partially overhanging a newly formed 30-foot cliff. This landslide resulted in the loss to plaintiffs of a block of earth 30 feet wide and 100 feet long, and deprived them of subjacent and lateral support essential to the stability of their house.

Plaintiffs reported their loss to defendant, and on May 1, 1958, defendant denied all liability, asserting that the landslide had been caused by risks specifically excluded by the policy. Subsequent to this denial of liability, however, plaintiffs and defendant respectively appointed appraisers to determine the amount of plaintiffs' loss. Such a procedure was provided for in the policy if the parties were unable to agree as to the cash value or amount of loss in any given case. This appraisal resulted in a determination of plaintiffs' loss and damage in the following amounts: dwelling, including attached building and garage, $50; personal property in the dwelling, $125; trees, shrubs and lawn, $800; fences, $150; concrete walk, $105; extra living expenses, $250. The appraisers further determined, at the request of plaintiffs, that the cost of a retaining wall and fill necessary to the support of the dwelling was $19,000.

Plaintiffs brought the instant action upon the policy, asserting that defendant had refused to comply with its contract of insurance. Plaintiffs also joined a second count for declaratory relief which they voluntarily abandoned during the course of the trial. Following a trial had without a jury, judgment was entered for plaintiffs in the amount of $18,980.53.[1]

Appellant now contends that its policy specifically excluded liability for all loss and damage caused by flood or

[1]Pursuant to a pretrial stipulation between the parties, any amount recovered by plaintiffs was to be paid to The Equitable Life Assurance Society of the United States, as the beneficiary of a deed of trust from plaintiffs. The Equitable Society was to retain the amount due and owing on its promissory note and then turn over to plaintiffs the balance.

high water, and that the evidence conclusively establishes that respondents' loss was due to one or both of these factors; hence, that the trial court erred in awarding respondents any damages whatever. The record does not bear out appellant's contention. The testimony of respondent Walter Hughes reveals that it had been raining steadily for about six weeks prior to the occurrence of the landslide. However, the water level in Las Trampas Creek was still 10 feet below the top of the bank at the time of the accident. Although the water continued to rise for two days thereafter, it never attained a greater height than 2 feet from the top of the bank. Under such circumstances, flood waters cannot be held the cause of the slide. There is no evidence that the creek ever overflowed its banks, either before or after the accident occurred.

■ On the issue of "high water," the testimony of two expert witnesses was introduced into evidence. Respondents' witness, Mr. John Trantina, testified that in his opinion the landslide was caused by the build-up of water pressure or ground water. Mr. Trantina testified that the ground water came from two sources, rain which fell upon the ground and water which infiltrated into the soil from the stream. Eventually the absorption of so much water into the soil resulted in hydrostatic pressure which caused the soil to fail. Mr. Trantina testified that erosion from the stream itself contributed to the landslide only in the sense that it furnished some water to the soil and thus caused an increase in hydrostatic pressure.

Appellant's expert, Mr. Hugh O'Neil, was of the opinion that the large quantity and high velocity of the flow of water in the creek eroded the banks and thus caused the landslide to occur. He also testified, however, that the rain might have been a contributing factor, since it could have weakened the soil and thus allowed it to be more easily eroded by the stream.

In view of the conflicting expert testimony, there was ample evidentiary support for the trial court's finding that the landslide was caused solely by "the soaking of the land from heavy rains with consequent hydrostatic pressure and loosening of the soil." ■ Even if the trial court could be deemed to have erred in finding that the landslide was in no way caused or contributed to by the water in the creek, it is difficult to see how appellant was in any way prejudiced thereby. "It has been held that when two causes join in causing an injury, one of which is insured against, the insured is covered by the policy. . . ." (*Zimmerman* v. *Continental Life Ins. Co.* (1929) 99 Cal.App. 723, 726 [279 P. 464].) Appellant's

expert conceded that continued rains might have contributed to the landslide by weakening the soil. Respondents' expert testified that the slide was due to water pressure in the soil, and he indicated that the flow of water in the stream contributed to the accident in only a minor degree. Since appellant has at no time denied coverage for losses caused by the pressure of ground water, we are satisfied that the rule of the Zimmerman case should control and that respondents' loss is not barred by the "high water" exclusion.

 Appellant calls our attention to Insurance Code, section 532, which provides as follows: "If a peril is specially excepted in a contract of insurance and there is a loss which would not have occurred but for such peril, such loss is thereby excepted even though the immediate cause of the loss was a peril which was not excepted." In the instant case, there was evidence from which the trial court could have concluded that the loss would have occurred even in the absence of the increased flow of the creek. Since Mr. Trantina's testimony was to the effect that the creek contributed to the slide in only a minor way, the inference logically arises that the accident would have happened even had the creek remained at a more normal level. Further, appellant has failed to show that respondents' loss would not have occurred "but for" a peril specifically excepted under the policy. This being the factual situation, the trial court properly found that respondents were not barred by the exclusions of the policy.

 Appellant next asserts that its policy insured the building structure and foundations of respondents' house, but did not insure the soil or land underneath the building. Appellant points out that the policy sets forth a $16,000 limit of liability for "Coverage A—Dwelling." Above the list of coverages is a reference to "Construction of dwelling" and the word "frame" is typed in. Appellant also refers to the "Amendatory Endorsement" to the policy where the following provision is set forth beneath the heading "Property and Interests Covered": "Coverage A—Dwelling: Dwelling building described in the declarations, including its additions and extensions, architects' fees, lawns, building equipment, fixtures and outdoor equipment pertaining to the service of the premises (if the property of the owner of the dwelling), while located on the premises of the described dwelling or temporarily elsewhere, and all lumber and materials on such premises or adjacent thereto incident to the construction, alteration or repair of such dwelling. Trees, Shrubs, or Plants Are Not

Covered.'' Appellant contends that this endorsement specifically lists all the items to be included within "Coverage A." Since no mention is made of the land or soil underlying the building, appellant asserts that the "dwelling" coverage cannot be deemed applicable to a loss of land, even if the effect of this loss is to deprive the house of its support. Appellant also cites paragraph 6, subdivision a, of the "All Physical Loss" building endorsement, which sets forth certain maximum sums for which the insurer will be liable in replacing the damaged parts of the "building structure." It is appellant's position that this specific reference to "building structure" clearly indicates that coverage was to be limited to the building alone and was not to extend to the underlying earth.

Respondents counter these arguments by pointing out that the policy itself consists of a combination Homeowners Policy B, purportedly superseded by an amendatory endorsement and enlarged by an "All Physical Loss" building endorsement to which has been attached an "Other Insurance Endorsement," an extension of theft coverage and a mortgagee clause. Respondents assert that this compilation is "an underwriting nightmare which defies analysis." Although the amendatory endorsement upon which appellant relies does describe Coverage A in terms of "dwelling building," respondents point out that an almost identical clause is set forth elsewhere in the policy, and that Coverage A is there made applicable to the "dwelling" rather than the "dwelling building." Respondents assert that the variation between the two clauses creates ambiguity and fails to clearly limit coverage to the building structure alone. Respondents also stress the fact that the policy specifically excludes trees, shrubs or plants, and thereupon contend that appellant should have added an exclusion applicable to the underlying ground had it so desired to limit the policy's coverage. Respondents also point to the fact that paragraph 6, subdivision b(4), of the "All Physical Loss" endorsement sets forth certain insured items to be disregarded in determining the full replacement cost of the building structure. The items to be disregarded are "excavations, underground flues and pipes, underground wiring and drains, and brick, stone or concrete foundations, piers and other supports which are below the surface of the ground . . ." Respondents contend that the only logical meaning to be given "other supports" is the support furnished by the ground itself and thus assert that the policy must be deemed applicable to the underlying soil.

In *Pfeiffer* v. *General Ins. Corp.* (N.D. Cal. S.D. 1960) 185 F.Supp. 605, the court had before it an insurance policy containing many of the same provisions set forth by appellant's policy. In the *Pfeiffer* case, plaintiffs' home had been damaged by a landslide in such a manner as to damage the house itself in the amount of $8,000. An additional expenditure of $23,000 was necessary in order to stabilize the land beneath the house. The sole question before the court was whether the policy issued by defendant to insure plaintiffs' "dwelling" covered the land underlying the house, as well as the actual building itself. The court, in setting forth certain provisions of the policy, noted that "construction of the dwelling" was described as " 'shake roof, frame.' " In referring to the property insured and the coverages afforded, the policy included the following clause: " 'A. Dwelling. Coverage A applies to the dwelling described in the declarations, including architect's fees, lawns, building equipment and fixtures and outdoor equipment pertaining to the service of the premises (of the property of the owner of the dwelling), while located on the described premises, and all lumber and materials on the premises or adjacent thereto incident to the construction of such dwelling, But Not Trees, Shrubs Or Plants.' " (P. 607.) The "All Physical Loss" endorsement of the policy set forth the maximum sums for which the company would be liable "in replacing the damaged parts of the building structure."

In analyzing the policy in the light of defendant's contention that it applied to the building alone and not to the soil underlying the building, the court pointed out that the reference to a " 'shake roof, frame' " house is "descriptive of the building itself and does not shed light on the present problem of interpretation of the term 'dwelling.' " (P. 607.) In reference to the "All Physical Loss" endorsement, the court stated that this clause was obviously limited to losses incurred to the building alone. "However, it does not enable the court to construe the meaning of 'dwelling' except to establish the fact that it obviously includes the building." (P. 607.)

The court then went on to point out that the word "dwelling" could be interpreted either broadly or narrowly, depending on its particular context, and noted that under the doctrine of the common law, it included the curtilage. The court then stated: "In the case at bar it is manifest that the land underlying the house must be encompassed within the word 'dwelling' unless the policy is to be interpreted as illusory. It ap-

pears to this court, and the court finds, that no amount of repairs to the present structure *alone* will cure the damage or replace the dwelling until the earth movement under the structure is stabilized." (P. 608.) Appellant asserts, however, that the policy in the instant case is distinguishable from the *Pfeiffer* policy because the Coverage A description set forth in the amendatory endorsement refers to the "dwelling building" rather than to the "dwelling" as in *Pfeiffer*. Although respondents have pointed out that the basic policy itself described Coverage A in terms of "dwelling," appellant contends that the endorsement amends and supersedes this reference to "dwelling" and thus resolves any ambiguity inherent in this term.

The rule is well established that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. "If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates." (*Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 35 [307 P.2d 359].) In the case at bar, respondents were issued a policy insuring them against all physical loss to their "dwelling" or "dwelling building." Although the policy specifically provides for the exclusion of certain items which might conceivably be considered within Coverage A, such as trees, shrubs or plants, the policy nowhere provides that the ground underlying the dwelling building is to be excluded from coverage. Under such circumstances, the question of whether the term "dwelling" or "dwelling building" is controlling is of little significance. In the *Pfeiffer* case, the court pointed out that to interpret the word "dwelling" in such a manner as to exclude the underlying land would be to render the policy illusory. We are of the same opinion that the same rule applies to the words "dwelling building." To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this

manner. Respondents correctly point out that a "dwelling" or "dwelling building" connotes a place fit for occupancy, a safe place in which to dwell or live. It goes without question that respondents' "dwelling building" suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a "dwelling building" in the sense that rational persons would be content to reside there. We conclude that appellant's policy should and can be interpreted in such a manner as to cover the damage to respondents' "dwelling building" as a result of the landslide.

Appellant next contends that even if its policy can be deemed to cover the damage caused respondents' dwelling building by the landslide, this damage was completely repaired by the Contra Costa County Flood Control District without cost to respondents prior to the trial of this action. The appellant urges that since the Flood Control District replaced the soil beneath respondents' building, completely stabilizing it, and thus eliminated any possible loss by reason of any lack of stability of their dwelling, respondents cannot be deemed to have suffered any damage which would entitle them to recover under the policy. Appellant asserts that its policy is one of indemnity, and contends that such a policy entitles the insured to recover only the amount of actual pecuniary loss suffered, and does not allow them (as appellant phrases it) to recover double damages (namely, the cost of fill and retaining wall).

Respondents, on the other hand, assert that the amount of their loss became fixed immediately after the occurrence of the landslide; that appellant expressly bound itself to pay specified damages in the event of a loss resulting from certain risks enumerated in its policy; that such a loss has occurred; that their property has been restored through the gratuitous act of a third party which cannot inure to the benefit of appellant insurer and so deprive them of their right to recovery. Stated in other words, respondents assert that the action of the Flood Control District was a purely gratuitous act, a windfall which must inure to the benefit of either respondents or appellant, and since appellant was compensated through premiums to reimburse respondents for their loss, this windfall should benefit respondents and should not relieve appellant from liability under its policy.

We have noted that at one stage of its presentation on this appeal, appellant conceded that if the act of the Flood Control

District was a gratuitous one, then it would not be in a position to claim the benefit thereof. We quote from page 9 of the appellant's opening brief: "Plaintiffs argue that the action of the Flood Control District is like the situation where after a fire loss the neighbors rebuild the destroyed home, something, obviously, which would not be a good defense to an insurer under its policy. But in the fire case the action of the neighbors would be gratuitous; they have no duty to repair the burned home. There would be no reason to let the insurer take advantage of this charity on their part." However, we note that in the closing brief and on oral argument, appellant retreats from this concession and now insists upon its full measure of benefit.

We believe appellant's first appraisal of its rights to be the correct one. We have before us a record that supports the trial court's finding that the cause of damage in this case was solely brought about by hydrostatic pressure built up by about six weeks of steady rain soaking the land. Any action of the district, therefore, in cleaning out Las Trampas Creek watercourse could not in any manner furnish a basis for any action against it by the insureds, regardless of the informal expressions with respect thereto by the parties to this litigation. Further, the fact that the district in carrying out its program saw fit to restore the bank of the creek by earth fill and thus stabilized the property of plaintiffs, instead of erecting a concrete wall or watercourse to contain the flow of the stream, cannot be interpreted as the fulfilling of an obligation on the part of the district.

Our research has failed to disclose any California authority on the precise point raised by the parties. We find that New York has adopted the rule that an insurer is not entitled to the benefit of the fact that the insured's loss has been cured by the act of a third party, but that its liability under the policy remains unaffected. We are in accord with the New York rule. We find the rule first expressed in the case of *Foley* v. *Manufacturers' & Builders' Fire Ins. Co. of New York* (1897) 152 N.Y. 131 [46 N.E. 318]. In that case, the plaintiffs were the owners of land upon which certain buildings were being constructed. When the buildings were near completion, they were destroyed by a fire, and plaintiffs sought recovery under their policy of fire insurance. Defendant insurer denied liability, asserting that the building contractor, pursuant to its agreement with plaintiffs, was still obligated to complete the buildings at no additional cost to plaintiffs.

The court rejected the insurer's contention, and stated, at page 319 [46 N.E.] : "But the contract relations between the plaintiffs and the contractors is a matter in which the defendant has no concern. . . .

"The fact that improvements on land may have cost the owner nothing, or that, if destroyed by fire, he may compel another person to replace them without expense to him, or that he may recoup his loss by resort to a contract liability of a third person, in no way affects the liability of an insurer, in the absence of any exemption in the policy." The rule set forth in the *Foley* case has more recently been applied in *Alexandra Restaurant* v. *New Hampshire Ins. Co.* (1947) 272 App.Div. 346 [71 N.Y.S.2d 515]. The plaintiff in that case was a lessee who had insured certain structural improvements against fire. Pursuant to the lease, however, the plaintiff's landlord was obligated to repair any damage to these improvements. A fire subsequently resulted, and damages of nearly $4,000 resulted to the insured improvements. Plaintiff brought suit against the insurer to recover for this loss, and defendant insurer denied liability on the ground that the landlord had completely restored the premises after the fire and that plaintiff lessee could thus be deemed to have suffered no loss. The court, after quoting at length from the Foley decision, held that plaintiff was entitled to recover the full amount of his loss from defendant. In refuting defendant's argument that a contract of indemnity resulted in liability only for the amount of pecuniary loss actually suffered, the court stated, at page 521 [71 N.Y.S.2d] : "Joyce on the Law of Insurance, vol. 1. 2d Ed., §§ 24, 24a, pp. 123, 125, defines 'indemnity' to mean :

" '. . . that the party insured is entitled to be compensated for such loss as is occasioned by the perils insured against, in precise accordance with the principles and terms of the contract of insurance.'

" 'Nor are his damages to be diminished because he has collateral contracts or relations with third persons which relieve him wholly or partly from the loss against which the insurance company agreed to indemnify him.' "

In direct opposition to the above-discussed New York rule is the Wisconsin rule, which appears to have originated in *Ramsdell* v. *Insurance Co. of North America* (1928) 197 Wis. 136 [221 N.W. 654]. (See also the *Maryland* case of *Glens Falls Ins. Co.* v. *Sterling* (1959) 219 Md. 95 [148 A.2d 453].)

Appellant next directs us to a limitation in the policy stating that respondents were insured "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . ." Based thereon, appellant argues that its liability is limited to the *actual cash value* of the property. In this regard, the trial court made findings which appellant contends are to some extent conflicting. We refer to the findings that the *market value* of the dwelling immediately prior to the landslide was $19,000, and that the *actual cash value* of the dwelling immediately prior to the landslide was also $19,000, and that at the time the landslide occurred the replacement cost of the house and garage was $17,400 and the *actual cash value* of the house and garage was $14,900. Since the court found the cash value of the house and garage to be only $14,900, appellant asserts that the finding that the cash value of the "dwelling" was $19,000 must have been based on the conclusion that the land beneath the house was included within the "dwelling" coverage. Appellant thus repeats its argument that the policy's reference to "dwelling building" must be viewed as limiting coverage to the building structure itself. This contention has already been discussed and resolved adverse to appellant.

Appellant asserts, however, that there was no evidence to support the trial court's finding that the actual cash value of the dwelling was $19,000, even if it can be assumed that such "dwelling" encompassed the underlying land. Appellant points out that the appraisers' award listed replacement value of the building and garage as $17,400, and the depreciated cash value of these same items as $14,900. Since no reference whatever was made to the figure of $19,000, appellant asserts that the trial court must have concluded that market value was synonymous with actual cash value. Appellant contends that it was prejudicial error to consider market value at all.

It must first be noted that appellant's policy provides for the appointment of two qualified appraisers to determine the "actual cash value" of each item. No reference whatever is made to "depreciated" cash value, either in the appraisal clause or the clause limiting appellant's liability to actual cash value. As is pointed out in 61 American Law Reports 2d 714, footnote 3, the standard clause contained in the majority of insurance policies limits liability to "actual cash value, with

proper deduction for depreciation." Since appellant chose to omit this provision from its policy, the logical assumption would be that it intended to limit its liability to actual cash value *without* deduction for depreciation. The appraisers made no finding as to undepreciated actual cash value, and it would seem clear that the trial court, under these circumstances, was compelled to look elsewhere. During the course of the trial, one of the two appraisers who prepared the award testified that before the loss the market value of the dwelling was $19,000. Although appellant contends that market value cannot be considered as synonymous with cash value, the following statement is set forth at 61 A.L.R.2d 714: "Where property is of such nature that its market value can be readily determined, market value has frequently been applied as the test or criterion of actual cash value of property at the time of loss, under policies insuring to that extent." Under these circumstances, the trial court was justified in finding that the actual cash value of the dwelling was $19,000. Admittedly this amount exceeded the limit of liability for Coverage A, therefore the trial court properly awarded respondents the full limit of $16,000 as damages to their dwelling (plus the additional limits for personal property damage, fence and walk damage, and living expenses).

■ Appellant also asserts that the appraisers' award of $50 for loss and damage to the "dwelling" must be controlling. This position is untenable. The appraisers found that the cost of a retaining wall and fill was $19,000. The function of appraisers is to determine the amount of damage resulting to various items submitted for their consideration. It is certainly not their function to resolve questions of coverage and interpret provisions of the policy. The mere fact that they apparently considered the "dwelling" to be limited to the house and attached garage did not deprive the court of its right to interpret the policy in a different manner. (See *Feinbloom* v. *Camden Fire Ins. Assn.* (1959) 54 N.J.S. 541 [149 A.2d 616, 620].)

■ Appellant's final assertion is that the trial court erred in awarding respondents interest commencing at the date of the loss. This contention is valid. The policy specifically provides that any loss for which the company may be liable "shall be payable 60 days after proof of loss . . . is received . . . and ascertainment of the loss is made either by agreement between the insured and this company . . . or by the filing with this company of an award as herein provided."

 The general rule in regard to interest where the policy in question contains a provision of this nature is that the principal payable under the policy will not bear interest for any time before the period so provided has expired, but will bear interest from that time. Our California courts have followed this rule. (See *Koyer* v. *Detroit Fire & Marine Ins. Co.* (1937) 9 Cal.2d 336 [70 P.2d 927].)

 Although respondents cite decisions which have allowed interest from the date of loss where an insurer has denied liability, respondents have cited no California authority in support of this proposition. Furthermore, the facts in the instant case show that appellant's denial of liability was followed by the appointment of appraisers to determine the amount of loss incurred. The parties having so acted, appellant is entitled to rely on the clause of its policy stating that liability should not commence until 60 days after filing with appellant of the appraisers' award. In *Kahn* v. *Allemannia Fire Ins. Co.* (1936) 16 Cal.App.2d 39 [60 P.2d 149], the trial court entered judgment on a policy which included interest from the date of the loss by fire, despite the fact that the policies provided that the loss should be payable " 'in thirty days after the amount has been obtained, either by agreement or by appraisement.' " (P. 41.) Since the amount of the loss had been duly determined by appraisement on August 31, 1934, the appellate court held that interest should have been allowed only from September 30, 1934. The court therefore modified the judgment by striking out the interest prior to September 30, 1934, and the judgment, as so modified, was affirmed.

The appraisers' award herein was filed with appellant's claims department on November 20, 1958; 60 days thereafter respondents' interest commenced.

The judgment is therefore modified by striking out all interest prior to January 19, 1959, and as so modified the judgment is affirmed. Respondents to recover costs.

Kaufman, P. J., and Agee, J., concurred.

A petition for a rehearing was denied February 13, 1962, and appellant's petition for a hearing by the Supreme Court was denied March 14, 1962.