Filed 9/2/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| APPLE ANNIE, LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>OREGON MUTUAL INSURANCE COMPANY,<br><br>Defendant and Respondent. | A163300<br><br>(San Francisco County Super. Ct. No. CGC-20-585712) |

The COVID pandemic and ensuing lockdown have generated a host of legal issues. One of the most momentous, in terms of the potential monetary liability, is whether businesses ordered by government decree to close or suspend operations could get compensation under the business income coverage of the standard comprehensive commercial liability policy. The issue has generated opinions from different Courts of Appeal, all of which have held that the issue comes down to whether the insured can allege it suffered "direct physical loss of or damage to [the insured] property." Having lost in the trial court, the insured here tells us "this appeal can be viewed as a referendum on whether [those] decisions were correctly decided." We conclude that they were, add our agreement with the other cases, and thus affirm the judgment on the pleadings for the insurer.

1

## BACKGROUND

At all relevant times, plaintiff Apple Annie, LLC, operated restaurants in Marin, San Francisco, and Santa Barbara counties.  Defendant Oregon Mutual Insurance Company issued Apple Annie a comprehensive commercial liability and property insurance policy that, as relevant here, promised in general to "pay for direct physical loss of or damage to Covered Property at the [insured] premises," and in particular to "pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.[1].  The suspension must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss."  The policy did not define "direct physical loss of or damage."

The policy included two provisions that will have only glancing provisions relevant to our analysis and conclusion.[2]

---

[1] " 'Period of restoration':  [¶] a.  Means the period of time that: [¶] (1) Begins:  [¶]  (a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or [¶]  (b) immediately after the time of direct physical loss or damage for Extra Expense Coverage; [¶]  caused by or resulting from any Covered Cause of Loss at the described premises, and [¶]  (2) Ends on the earlier of:  [¶]  (a)  The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or [¶]  (b)  The date when business is resumed at a new permanent location.  [¶]  b.  Does not include any increased period required due to the enforcement of any ordinance or law that: [¶]  (1) Regulates the construction, use or repair, or requires the tearing down of any property . . . ."

[2] This first, an exclusion, provides that "We will not pay for loss or damage caused directly or indirectly by any of the following. . . . . [¶]  **Ordinance Or Law**  [¶]  The enforcement of any ordinance or law: [¶]  Regulating the construction, use, or repair of any property . . . .  [¶]  This exclusion . . . applies  whether the loss results from:  [¶]  An ordinance or law that is enforced even if the property has not been damaged . . . . "  It is black-letter insurance law that exclusions are only considered after it is established

According to Apple Annie's complaint, in March 2020, first the Marin and San Francisco Departments of Public Health, and then the Governor, issued "Shelter in Place orders,"[3] which Apple Annie alleged "caused [it] to suspend business operations at all its locations, which resulted in an immediate loss of business income."[4]  Oregon Mutual denied Apple Annie's claim for its "business income loss."

that coverage exists under the policy.  (E.g., *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 (*Waller*); *Rosen v. Nations Title Ins. Co.*(1997) 56 Cal.App.4th 1489, 1497; *Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017.)  This policy language is mentioned only because it will be of assistance in demonstrating why there is no coverage here.

The second is a provision that Oregon Mutual would pay for "the actual loss of Business Income . . . caused by action of civil authority that prohibits access to the described premises."  This provision was also pegged to "direct physical loss of or damage to property."  Although this particular provision features in some of the decisions discussed hereafter, it was not invoked here.

[3] Apple Annie attached only the Governor's March 19, 2020  order to its complaint.  Oregon Mutual asked the trial court to take judicial notice of the Governor's order, plus another made on March 4, 2020, and the closure orders of the relevant health authorities in Marin and San Francisco counties, but no ruling appears in the record.  Oregon Mutual renewed the request in this court, which Apple Annie did not oppose.  Having already granted the motion with respect to the Governor's orders, and the Marin and San Francisco orders, we now grant it as to the relevant orders by the Health Officer of the Santa Barbara County Public Health Department, dated April 10 and April 24, 2020.

[4] As will be noted in a moment, this cause concluded in the trial court when Oregon Mutual's motion for judgment on the pleadings was granted without leave to amend.  Such a procedure is the functional equivalent of a general demurrer and is evaluated according to identical standards, the most important of which is that the pleader's factual allegations are accepted as true.  (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 165; *Smiley v. Citibank* (1995) 11 Cal.4th 138, 145–146.)  We mention this for two reasons.

First, Oregon Mutual states in its brief that, notwithstanding the orders, "Apple Annie could [still] sell meals for takeout or delivery, but

Apple Annie's action for breach of contract damages ended when the trial court granted Oregon Mutual's motion for judgment on the pleadings and entered a judgment in its favor.

## DISCUSSION

Apple Annie's opening brief was filed on November 16, 2021. It deployed cogent reasoning and analyzed a veritable mountain of authorities—published and unpublished, state and federal—on the issue of coverage.

The very same day, November 16, Division One of the Fourth District Court of Appeal filed its opinion in *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688 (review denied Mar, 9, 2022, S272450) (*Inns-by-the-Sea*). Noting that "hundreds of merit-based rulings have been issued in both state and federal courts," the court then summarized: "The overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income [citations], along with each federal appellate court to consider the issue [citations], including the Ninth Circuit applying

customers could not sit and eat in its restaurants," and its business was merely "impeded." However, the words "take-out," "deliver," or "delivery" are used in some of the closure orders. Accordingly, we take Apple Annie's allegation that it "suspend[ed] business operations at all its locations" to mean that all normal business activity of serving dining patrons in situ ceased in the wake of the closure orders.

Second, all of the Courts of Appeal decisions discussed here involved general demurrers. One consequence of this common posture is that the reviewing courts were often considering scenarios and arguments based upon the specific allegations of the insured's complaint against the insurer. No such individualized arguments are made here.

4

California law (*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America* (9th Cir. 2021) 15 F.4th 885)."[5]  (*Id.* at p. 692, fn. 1.)

After a comprehensive survey of the subject, the court concluded that a business that closed pursuant to a government shut-down order had not suffered "direct physical . . . damage to" the business's property.  This was a matter of plain English:

"The words in the phrase 'direct physical damage' all have commonly understood meanings.  'Physical' is defined as 'having material existence: perceptible especially through the senses and subject to the laws of nature.'  [Citation.]  'Direct' is defined as 'proceeding from one point to another in time or space without deviation or interruption,' 'stemming immediately from a source,' and 'characterized by close logical, causal, or consequential relationship.'  [Citations.]  'Damage' is defined as 'loss or harm resulting from injury to . . . property . . . .' "  (*Inns-by-the-Sea, supra*, 71 Cal.App.5th 688, 699–700.)

The *Inns-by-the-Sea* court concluded that the Covid virus did not itself cause "direct physical damage."  " '[T]he presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts similar to those required to abate asbestos or remove poisonous fumes which permeate property.[6]  Instead, all that is required for

---

[5] Apple Annie devotes considerable space in its briefs to exposing the myriad "shortcomings" of *Mudpie*'s reasoning.  There is scant point in taking up this challenge because the Ninth Circuit was anticipating what would be the position of the California courts.  As those courts have now spoken, it is to them that attention is more properly paid.

[6] Among the cited examples of incorporeal contaminants that could amount to "direct injury" were carbon monoxide, and odors from ammonia, sulfuric gas, and "a past methamphetamine operation in a house."  (*Inns-by-the-Sea, supra*, 71 Cal.App.5th 688, 701–702.)

Plaintiff to return to full working order is for the [government orders and restrictions to be lifted].' [Citation.] 'This case . . . concerns an invisible virus that is present throughout the world. . . . It is that general presence, and not a specific physical harm to covered properties, that has caused governments at all levels to consider restrictions. The question, therefore, is one of "widespread economic loss due to restrictions on human activities, not the consequence of a direct physical loss or damage to the insured premises." ' " (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, 704.)[7]

Having concluded that the insured business suffered no "direct physical *damage*" to its property, the court was equally unwilling to concede that the insured being forced to suspend operations amounted to a "direct physical *loss*" of its property. This conclusion had the support of considerable authority, starting with a leading insurance treatise:

"The Couch treatise sets forth the generally recognized principle in the context of first party property insurance that mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss: 'The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers *a detrimental economic impact* unaccompanied by a distinct, demonstrable, physical alteration of the property.' " (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, 705–706, quoting 10A Couch on Insurance

---

[7] The court did note that "Given our discussion, . . . it is possible that in the context of real property, the 'distinct, demonstrable , physical alteration' referenced in the Couch treatise [citation], could include damage that is not structural, but instead is caused by a noxious substance or an odor." (*Inns-by-the Sea*, *supra*, 71 Cal.App.5th 688, 706, fn. 19.)

(3d ed. 2016) § 148:46, pp. 148-96–148-98.)  And here, the court was not blazing a new trail:  "California law has repeatedly cited the Couch treatise in adopting this rule.  [Citations.]"  (*Inns-by-the-Sea*, *supra*, at p. 706.)

Such, the court said, was also the conclusion of other courts:  "[T]he Business Income coverage applies when there is a suspension of operations caused by 'direct physical loss of' property.  As numerous courts have observed, the words 'direct' and 'physical' preclude the argument that coverage arises in a situation where the loss incurred by the policyholder stems solely from an inability to use the physical premises to generate income, without any other physical impact to the property.  [Citations.]  As the federal Eighth Circuit Court of Appeals persuasively explained, because the policy language requires 'direct "physical loss" ' to trigger coverage, 'there must be some *physicality* to the loss . . . of property—*e.g.*, a physical alteration, physical contamination, or physical destruction . . . .  The policy cannot reasonably be interpreted to cover *mere loss of use* when the insured's property has suffered no physical loss or damage.'  [Citation.]  'The cases consistently conclude that there needs to be some *physical* tangible injury . . . to support "loss of property" or a *physical* alteration or active presence of a contaminant to support "damage to" property.' "  (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, 706–707.)

Finally, the court deemed its conclusion fully harmonious with other language in the policy:  "The Policy's reference to the 'period of restoration' further supports our conclusion that mere loss of use, without any other physical impact to Inns' property, is not sufficient to trigger the business income coverage.  The Policy states, 'We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" *during the "period of restoration."*  The "suspension" must be caused by direct

7

physical loss of or damage to property at [Inns'] premises . . . .' (Italics added.) Significantly, the 'period of restoration' is defined as ending on the earlier of '(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or [¶] (2) The date when business is resumed at a new permanent location.'

"The Policy's focus on repairing, rebuilding or replacing property (or moving entirely to a new location) is significant because it implies that the 'loss' or 'damage' that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed, or if incapable of being *physically* fixed because it is so heavily destroyed, requires a complete move to a new location. Put simply, '[t]hat the policy provides coverage until property "should be repaired, rebuilt or replaced" or until business resumes elsewhere assumes physical alteration of the property, *not mere loss of use.*' " (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, 707.)

Some five months later, on April 21, 2022, Division One of the Second District agreed with the general conclusion reached in *Inns-by-the-Sea*—in *Musso & Frank Grill Co. Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753 (*Musso & Frank*).[8] Like *Inns-by-the-Sea*, this second decision is germane because it also considered and rejected a claim made here.

In our case, Apple Annie contends that "because the phrase 'physical loss of *or* damage to' is phrased disjunctively, 'loss of' and 'damage to' must each be given a separate meaning." Apple Annie reasons: "Because of this disjunctive framing, each concept must be accorded a separate, distinct meaning. An interpretation of 'loss of' that assigns it the same meaning as

---

[8] In light of the timing of *Musso & Frank*, and others that followed shortly, we requested supplemental briefing, which has been received.

'damage to' would do violence to the language of the policy by rendering the former term surplusage." Apple Annie also insists that such an interpretation would also contradict what is known as the "plain meaning rule," namely, an insurance policy and its terms are to be given their "plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller*, *supra*, 11 Cal.4th 1, 18.)

The *Musso & Frank* court rejected an identical contention, adopting the reasoning of a federal Circuit Court that treated the argument as a strained attempt to create an ambiguity that could be construed against the insurer. (*Musso & Frank*, *supra*, 77 Cal.App.5th 753, 757–759, citing *Oral Surgeons, P.C. v. The Cincinnati Ins. Co.* (8th Cir. 2021) 2 F.4th 1141.)[9] We believe this approach is sound. In any event, Apple Annie's reasoning ultimately leads to a dead end.

The plain meaning of this language is convincingly established in *Inns-by-the-Sea*. To urge a differentiation is, in one sense, pointless, because the

_____

[9] Three more circuits have subsequently come to the same conclusion: *Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co.* (10th Cir. 2021) 21 F.4th 704, 711; *Sandy Point Dental P.C. v. Cincinnati Ins. Co.* (7th Cir. 2021) 20 F.4th 327, 332; and *Santo's Italian Café, LLC v. Acuity Ins. Co.* (6th Cir. 2021) 15 F.4th 398, 404, 405–406. One expression is cogently pertinent: "Goodwill also argues that the phrase 'direct physical loss of or damage to' encompasses more than physical damage to property because 'loss of' and 'damage to' would otherwise be redundant. We disagree. The phrase 'loss of' refers to dispossession of property—for example, via theft— and therefore has a different meaning from the term 'damage to.' As the Sixth Circuit explained, '[t]here is no need to read "physical loss" to include a deprivation of some particular use of a property in order to give the phrase independent meaning. That possibility could occur whenever a policy holder is deprived of property without any damage to it, say a portable grill or a delivery truck stolen without a scratch.' " (*Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co.*, *supra*, at p. 711, quoting *Santo's Italian Café, LLC v. Acuity Ins. Co.*, *supra*, at p. 404.)

terms are often used in overlapping and redundant ways. (See *Inns-by-The-Sea, supra*, 71 Cal.App.5th 688, 700 [" 'Damage' is defined as 'loss or harm resulting from injury to . . . property . . . .' "]; cf. *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 780 (*MRI Healthcare*) ["For there to be a 'loss' within the meaning of the policy, some external force must have acted upon the insured property to cause a physical change in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term," original emphasis omitted]; *Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1175 ["In its common usage, 'damage' includes harm, loss, injury, detriment, or diminution in value"]; *Jarrett v. Allstate Ins. Co.* (1962) 209 Cal.App.2d 804, 811 ["The word 'loss' is one of common use in insurance parlance. Webster defines 'loss' in connection with insurance as 'injury, destruction, or damage . . .' "].)

Moreover, even if there were any distinction between loss and damage,[10] it would become relevant only after detriment has been caused by a "direct physical" cause, which is not alleged here. (Cf. *Ward General Insurance Services Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 ["direct physical" modifies both "loss of" and "damage to"]; *Inns-by-The-Sea, supra*, at p. 699 [" 'the words "direct physical" . . . modify both "loss of" and "damage to." ' . . . Inns must establish that *either* 'direct physical . . .

---

[10] "[T]he word 'loss' may refer to complete destruction while 'damage' connotes lesser harm that may be repaired." (*Sandy Point Dental, P.C. v. Cincinnati Ins. Co., supra*, 20 F.4th 327, 332; see *Terry Black's Barbeque, L.L.C. v. State Automobile Mutual Ins. Co.* (5th Cir. 2022) 22 F.4th 450, 456 [" 'Loss' . . . 'means . . . being . . . destroyed, ruin, or destruction.' "].) An obvious instance of loss is when insured property is stolen.

damage to' property at the premises *or* 'direct physical loss of' property at the premises caused its suspension of operations," quoting *Ward*].)

This construction comports not only with the plain meaning rule, but also with the principle that courts will not strain to create an ambiguity that can be construed against the insurer. (See, e.g., *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37; *Deere & Co. v. Allstate Ins. Co.* (2019) 32 Cal.App.5th 499, 514; *American Internat. Underwriters Ins. Co. v. American Guarantee & Liability Ins. Co.* (2010) 181 Cal.App.4th 616, 629.)

Whether a policy provision is ambiguous is an issue of law. (*Waller, supra*, 11 Cal.4th 1, 18; *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912; *Energy Ins. Mutual Limited v. Ace American Ins. Co.* (2017) 14 Cal.App.5th 281, 291.) And, as demonstrated by *Inns-by-the-Sea*, the fact that the policy does not define "direct physical loss of or damage to property" does not automatically make it ambiguous. (See *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868.) We conclude that the phrase "direct physical loss of or damage to" covered property is not ambiguous in the sense urged by Apple Annie—"the policy promises coverage when there is *either* a 'physical loss of' the insured property *or* 'damage to' the property. . . . Rather, it ['loss of'] includes the loss of beneficial use of or possession of the property."

The very next day after *Musso & Frank* was filed, Division Four of the Second District reached the same conclusion in *United Talent Agency v. Vigilant Insurance Co.* (2022) 77 Cal.App.5th 821 (*United Talent Agency* or UTA.) In the wake of *Inns-by-the-Sea*, the business-insured in *United Talent Agency* mounted a frontal attack that it claimed would return to first principles and original sources—an attack the Court of Appeal rejected:

11

"UTA acknowledges the holdings of *Inns-by-the-Sea* and similar cases that follow the Couch treatise in holding that 'physical loss' involves a 'distinct, demonstrable, physical alteration of the property.'  However, UTA asserts these cases and the Couch treatise are wrong in that Couch rejected the majority position, adopted the minority position, and now, '[f]or nearly a quarter of a century, Couch's misstatement has snowballed as a self-fulfilling prophesy.

"UTA further argues that in contrast to Couch, 'California courts have a long history of recognizing that "physical loss" can occur if a property is inherently dangerous and cannot be used.'  It cites *Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239 [(*Hughes*)] and *Strickland v. Federal Ins. Co.* (1988) 200 Cal.App.3d 792, [(*Strickland*)], which both considered the extent to which homeowners' insurance policies covered homes that became unstable due to landslides.  In *Hughes*, a nearby creek washed out a portion of the ground supporting the house, leaving it 'standing on the edge of and partially overhanging a newly formed 30-foot cliff.' (*Hughes, supra,* 199 Cal.App.2d at p. 243.)  In *Strickland*, the home was built on unstable, shifting ground, which caused ongoing structural issues, although the house was not uninhabitable.  (*Strickland, supra*, 200 Cal.App.3d at pp. 794–796.)  However, the issue in these cases was not loss of use of otherwise undamaged property.  To the contrary, the undermined ground beneath both houses placed the structures at serious risk.  Moreover, the risk was inextricably linked to the insured property.

"By contrast, the losses here arose from closures intended to limit the spread of a virus that can carry great risk to people but no risk at all to a physical structure.  As the trial court observed in sustaining the demurrer, UTA's alleged loss 'was not a physical deprivation of property, but rather an

12

interruption in business operations.'  The closure orders and other measures imposed in an effort to reduce the spread of the virus among people had little relationship to any particular location; rather, they were intended to reduce people's proximity to and interaction with one another, thereby reducing the risk that an infected person could infect others.  We therefore decline UTA's invitation to depart from the Couch treatise and the case law that relies upon it."  (*United Talent Agency*, *supra*, 77 Cal.App.5th 821, 832–833.)

The *United Talent Agency* court, like the *Inns-by-the-Sea* court, found reinforcement in the definition of "restoration" in the policy here (quoted at fn. 1, *ante*):

"In addition, the 'period of restoration' language in the policies demonstrates that coverage requires a physical loss requiring repair or replacement, not simply loss of use.  The policies covered 'actual or potential impairment of . . . operations' 'during the period of restoration,' defined as beginning 'immediately after the time of direct physical loss or damage by a covered peril to property,' and continuing until 'operations are restored,' including 'the time required to . . . repair or replace the property.'  Reviewing a similar policy, *Inns-by-the-Sea* stated, 'The Policy's focus on repairing, rebuilding or replacing property (or moving entirely to a new location) is significant because it implies that the "loss" or "damage" that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed, or if incapable of being *physically* fixed because it is so heavily destroyed, requires a complete move to a new location.'  (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 707.)  Thus, '[t]he definition of "period of restoration" provides an indication that the phrase "direct physical loss of" property was not intended to include the mere loss of use of physical property to generate income, without any other physical impact to property that could be repaired, rebuilt or replaced.'  (*Id.*

13

at p. 708.)  Several other courts have reached similar conclusions.  (See, e.g., *Mudpie, supra,* 15 F.4th at p. 892 ['To interpret the Policy to provide coverage absent physical damage would render the "period of restoration" clause superfluous']; *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*[, *supra,*] 20 F.4th 327, 333 . . . ; *Santo's Italian Cafe LLC v. Acuity Ins. Co.*[, *supra,*] 15 F.4th 398, 403 . . . ; *Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co.*[, *supra,*] 21 F.4th 704, 711 . . . .)

"We therefore follow the reasoning of *Inns-by-the-Sea* and similar cases in acknowledging 'the generally recognized principle in the context of first party property insurance that mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss.'  (*Inns-by-the-Sea, supra,* 71 Cal.App.5th at pp. 705–706.)  UTA's allegations of loss of use of insured premises and dependent premises due to the closure orders and other pandemic-related limitations are insufficient to establish 'direct physical loss or damage' entitling UTA to coverage under the relevant policies."  (*United Talent Agency, supra,* 77 Cal.App.5th 821, 833–834.)

Nor was the *United Talent Agency* court impressed by the insured's argument that "the physical presence of the virus on UTA's insured premises s constituted 'physical damage,' " (*United Talent Agency, supra,* 77 Cal.App.5th at p. 834), concluding that it too was answered by *Inns-by-the-Sea*:

"Many courts have rejected the theory that the presence of the virus constitutes physical loss or damage to property.  As the Seventh Circuit stated in rejecting a similar claim, 'While the impact of the virus on the world . . . can hardly be overstated, its impact on physical property is inconsequential:  deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days.'  (*Sandy Point*

14

*Dental* [*v. Cincinnati Ins. Co.*]*, supra,* 20 F.4th at p. 335.)  Or as the United States District Court, Southern District of California stated, 'If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result.'  [Citation.] The majority of cases in California (and elsewhere) are in accord.

"As *Inns-by-the-Sea* noted, there are 'some comparable elements between' allegations that the virus physically altered property and cases in which 'a physical force rendered real property uninhabitable or unsuitable for its intended use, without any structural alteration,' because 'the COVID-19 virus—like smoke, ammonia, odor, or asbestos—is a physical force.'  (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 703.)  However, *Inns-by-the-Sea* also stated that courts have rejected claims that 'short lived' contamination that can be addressed by simple cleaning constitutes direct physical loss.  (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 703, fn. 17.)  *Inns-by-the-Sea* discussed *Mama Jo's Inc. v. Sparta Ins. Co.* (11th Cir. 2020) 823 Fed.Appx. 868 [(*Mama Jo's*)], a case involving construction-related dust, which required only 'cleaning and painting,' and 'no need for removal or replacement of items.'  (*Mama Jo's, supra*, 823 Fed.Appx. at p. 879.)  The court stated that 'under Florida law, an item or structure that merely needs to be cleaned has not suffered a "loss" which is both "direct" and "physical." '  (*Ibid.*)  *Inns-by-the-Sea* also cited *Kim-Chee LLC v. Philadelphia Indemnity Ins. Co.* (W.D.N.Y. 2021) 535 F.Supp.3d 152, 161, in which the court noted that 'contamination that is temporary . . . is unlikely to qualify as a direct physical loss to the insured premises.'  The Second Circuit has since affirmed that ruling, stating, 'Even assuming the virus's presence at Kim-Chee's tae-kwon-do studio, the complaint does not allege that any part of its building or anything

15

within it was damaged—let alone to the point of repair, replacement, or total loss. . . . [W]e agree with the district court that the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under Kim-Chee's policy.' [Citation.]" (*United Talent Agency*, *supra*, 77 Cal.App.5th 821, 835–836, fn. omitted.)

And *United Talent Agency* concluded: "we agree with the majority of the cases finding that the presence or potential presence of the virus does not constitute direct physical damage or loss. While the infiltration of asbestos . . . or environmental contaminants . . . constituted property damage in that they rendered a property unfit for a certain use or required specialized remediation, the comparison to a ubiquitous virus transmissible among people and untethered to any property is not apt. Asbestos in installed building materials . . . and environmental contaminants . . . are necessarily tied to a location, and require specific remediation or containment to render them harmless. Here, by contrast, the virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks. Thus, the presence of the virus does not render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space." (*United Talent Agency*, *supra*, 77 Cal.App.5th 821, 838.)

Most recently, on July 13, Division Seven of the Second District filed its opinion in *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96 (*Marina Pacific*). There, after noting the holdings of *Inns-by-the Sea*, *United Talent Agency*, and various other cases, the Court

16

of Appeal went on to hold for the plaintiff insured, on the basis it had pled the element missing from the three earlier cases:  it "adequately alleged direct physical loss or damage."  Thus, the court held, Marina Pacific stated a claim for breach of the insurance policy (*Marina Pacific*, *supra*, at p. 108), and concluded:  "Because the insureds adequately alleged losses covered by Fireman's Fund's policy, they are entitled to an opportunity to present their case, at trial or in opposition to a motion for summary judgment.  The judgment of dismissal based on the trial court's disbelief of those allegations, whether ultimately reasonable or not, must be reversed."  (*Id*. at p. 114.)

In sum, and in light of the foregoing, we cannot agree with Apple Annie's primary contention that the policy language—"direct physical loss or damage to," including its disjunctive phrasing—is ambiguous and "subject to a reasonable construction that supports coverage."  Doing so, we reject what may be the two most consequential aspects of Apple Annie's position:  (1) that "no physical alteration is necessary to show that the policyholder has suffered a 'physical loss of' insured property if the governmental authorities issue orders that prohibit the policyholder from using the insured  property for its intended purpose," and (2) that" 'physical loss of' includes the loss of use of the insured property, even if that loss is temporary."  (See *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, *supra*, 15 F.4th 398, 402 ["A loss of use simply is not the same as a physical loss"].)[11]  Although the COVID virus has a

_____

[11] This rejection, however, must not be read as extending to the situations noted by the *Inns-by-the-Seas* court, namely a temporary dispossession necessary to "abate asbestos or remove poisonous fumes which permeate property," or similar phenomena which "necessitat[e] rehabilitation or restoration."  (*Inns-by-the-Seas*, *supra*, 71 Cal.App.5th 688, 704.)

Many years ago, this court recognized one such example, in *Hughes*, *supra*, 199 Cal.App.2d 239, a decision much examined in the parties' briefs— and mentioned in *Inns-by-the-Sea* ("The central relevant California opinion"),

17

physical presence, and thus Apple Annie may have suffered economic loss from the physical presence of the COVID virus, it has not suffered "direct physical loss of or damage to [its] property." (See *Inns-by-the-Sea*, *supra*, 71 Cal.App.5th 688, 704.)

Apple Annie's remaining arguments do not require extended discussion.

---

*Musso & Frank*, and *United Talent Agency*. There, confronted with a situation where sudden water erosion left the insureds' home "standing on the edge of and partially overhanging a newly formed 30-foot cliff," (*id.* at p. 243), we had no difficulty in concluding that the insureds had suffered damage to their home. We rejected the insurer's argument that there was no damage to the dwelling itself, and hence no claim under the policy: "To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been 'damaged' so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner. Respondents correctly point out that a 'dwelling' or 'dwelling building' connotes a place fit for occupancy, a safe place in which to dwell or live. It goes without question that respondents' 'dwelling building' suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a 'dwelling building' in the sense that rational persons would be content to reside there." (*Id.* at pp. 248–249.)

In sum, a residence that lacks earth beneath it—like a residence filled with noxious fumes, chemical contamination, or friable asbestos floating inside—has suffered "direct physical loss of or damage" that makes it unusable for its intended purpose.

Apple Annie submits that the COVID virus should receive similar treatment because it too "could be described as a 'noxious substance.'" Our previous discussion demonstrates why we cannot agree.

Apple Annie faults the trial court for relying on *MRI Healthcare*, *supra*, 187 Cal.App.4th 766, "because it involved different policy language." It is true that the policy in *MRI Healthcare* insured against "*accidental* direct physical loss to its property" (*id.* at p. 778, emphasis added), but that does diminish the force of the court's reasoning: "A direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.' [Citation.] The word 'direct' used in conjunction with the word 'physical' indicates the change in the insured property must occur by the action of the fortuitous event triggering coverage. In this sense, 'direct' means ' "[w]ithout intervening persons, conditions, or agencies; immediate." [Citation.]' [Citation.] For loss to be covered, there must be a 'distinct, demonstrable, physical alteration' of the property. (10A Couch on Insurance, *supra*, § 148:46, p. 148–81.)" (*MRI Healthcare*, *supra*, 187 Cal.App.4th 766, 779.)

Apple Annie also goes after *MRI Healthcare*'s reliance on the Couch treatise and its treatment of "direct physical loss." Adopting the conclusion of a recent article—Lewis et al., "Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences" (2021) 56 Tort, Trial & Ins. Prac. L. J. 621—Apple Annie urges us to accept that the Couch analysis is of "dubious provenance" and has subsequently been "uncritically accepted" by courts. We cannot agree with Apple Annie's conclusions.

As already shown, an attack on the Couch formulation was rejected in *United Talent Agency*. But there is a deeper ground. At this point in time, any analytical flaws in the Couch formulation have become largely academic in light of the now-existing wall of precedent confronting Apple Annie. When

19

originally published, the Couch formulation may not have reflected widespread acceptance by the courts, but such acceptance has now been achieved. As for its treatment in California, the *Inns-by-the Seas*, *Musso & Frank*, and *United Talent Agency* decisions are notable, not for "uncritical acceptance" of anything, but for the careful and conscientious examination shown by those courts of the weighty issues before them. At this point in time, these decisions constitute an independent intervening cause to any error in the Couch formulation. In other words, it will not do to attack the Couch formulation— one must now attack what the courts have done with it.

Apple Annie argues that "No exclusion stated in the Policy bars coverage as a matter of law because of the efficient-proximate-cause doctrine." So far as we can tell from the record, the words "efficient proximate cause" were never used before the trial court. Moreover, as already noted, exclusions are only considered when coverage exists (see decisions cited in fn. 2, *ante*), which in this case it does not. (Cf. *MRI Healthcare*, *supra*, 187 Cal.App.4th 766, 782 ["[T]he 'efficient proximate cause standard' comes into play in determining whether coverage exists when both excluded and covered perils *interact* to cause a loss"].) The same reasoning applies to Apple Annie's contentions regarding other policy exclusions.

Apple Annie makes a new argument in its supplemental brief, that its policy "includes a definition of 'property damage' that specifically contemplates the absence of physical alteration." And in claimed support, Apple Annie points to this definition: "17. 'Property damage' means: [¶] a. Physical injury to tangible property . . . or [¶] b. Loss of use of tangible property that is not physically injured." This definition is, as Apple Annie concedes, in the liability section of the policy. A similar argument was made, and rejected, in *United Talent Agency*, which observed that cases involving

20

comprehensive liability coverage "are of limited benefit in determining the scope of property insurance coverage.  '[T]he cause of loss in the context of property insurance is wholly different from that in a liability policy,' and a liability insurer 'agrees to cover the insured for a "broader spectrum of risks" than in property insurance.'  (*MRI Healthcare, supra*, 187 Cal.App.4th at p. 779, fn. 6.)"  (*United Talent Agency*, *supra*, 77 Cal.App.5th 821, 837.)

Finally, we note that, while *Marina Pacific* held for the insured, based on its pleading, in its supplemental brief Apple Annie acknowledges that the case does "not directly implicate Apple Annie's theory of coverage."

One other issue, injected late in this case in Apple Annie's supplemental brief, is whether Apple Annie should be granted leave to amend.

By way of brief background, in opposition to Oregon Mutual's motion for judgment on the pleadings, Apple Annie did not request leave to amend, nor did it do so in either of its briefs here.  However, in its supplemental brief, citing to *Marina Pacific*—and notwithstanding its acknowledgement that *Marina Pacific* "does not directly implicate [its] theory of coverage"— Apple Annie asserts that "*Marina Pacific* shows that there is a reasonable possibility that any defect with [its] complaint can be cured by amendment," going on to say that "there is a reasonable possibility that Apple Annie could amend its complaint to bring allegations similar to those brought by the plaintiff in *Marina Pacific*."  And, referring to the trial court's order here, Apple Annie asserts that "COVID-19 was in and around Apple Annie's insured premises," but the complaint did not allege that the presence of the virus on the premises triggered coverage.

The case Apple Annie relies on, *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, holds that it "ordinarily constitutes an abuse of discretion to

sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment." (*Id.* at pp. 970–971, internal quotation marks and cit. omitted.) And, of course, it is Apple Annie's burden to show such a reasonable possibility. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

In this regard, at oral argument we asked counsel for Apple Annie— able counsel with significant experience in insurance coverage issues—what Apple Annie would, or could allege. And counsel's candid response was that as an officer of the court he could not "tell [us] what [he] would allege as an amendment." Given that, the fact that this case has been pending for 25 months, and the further fact that *Marina Pacific* has been extant for over a month, we conclude that Apple Annie has not met the burden required of it to obtain leave to amend, and we thus deny the belated request.

## DISPOSITION

The judgment is affirmed.

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *




*Apple Annie, LLC v. Oregon Mutual Insurance Company* (A163300)

     *Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Honorable Richard B. Ulmer |
| Attorney for Plaintiff and Appellant, Apple Annie, LLC: | Shernoff Bidart Echeverria; Michael J. Bidart, Ricardo Echeverria, Steven Schuetze, Reid Ehrlich-Quinn; Hess Bower Adams-Hess, PC; Randy M. Hess |
| Attorney for Defendant and Respondent, Oregon Mutual Insurance Company: | Pacific Law Partners, LLP; Clarke Holland, David. B.A. Demo, Andrew P. Collier. |