Filed 2/24/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BEST REST MOTEL, INC., <br><br>     Plaintiff, Cross-defendant and Appellant, <br><br>     v. <br><br> SEQUOIA INSURANCE COMPANY, <br><br>     Defendant, Cross-complainant and Respondent. | D079927 <br><br><br><br> (Super. Ct. No. 37-2020-00015679-CU-IC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Affirmed.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, Milan L. Brandon II for Plaintiff, Cross-defendant and Appellant.

Nicolaides Fink Thorpe Michaelides Sullivan, Sara M. Thorpe, Timothy P. Kitt, and Kimberly A. Hartman for Defendant, Cross-complainant and Respondent.

Latham & Watkins, John M. Wilson, Brook B. Roberts, Christine G. Rolph, Steven Lesan, Corey McGehee and Erin Hallagan for Amici Curiae San Manuel Band of Mission Indians and San Manuel Entertainment Authority on behalf of Plaintiff, Cross-defendant and Appellant.

Covington & Burling, Rani Gupta and David B. Goodwin for Amicus Curiae United Policyholders for Defendant, Cross-complainant and Respondent.

Crowell & Moring and Mark D. Plevin for Amicus Curiae American Property Casualty Insurance Association Policyholders for Defendant, Cross-complainant and Respondent.

This appeal from a summary judgment in favor of Sequoia Insurance Company (Sequoia) is one of thousands of cases nationwide involving a claim for business interruption coverage arising out of the COVID-19 pandemic. The outcome here turns on whether there is evidence creating a triable issue that the insured, Best Rest Motel, Inc. (Best Rest), sustained lost business income "due to the necessary 'suspension' " of its operations "caused by direct physical loss of or damage" to the insured property.

In *Inns-by-the-Sea v. California Mut. Ins. Co.* (2021) 71 Cal.App.5th 688 (*Inns*), this court confronted the same legal issue and policy language, albeit in a different procedural context (a demurrer). In that case, we held there was no coverage where the complaint alleged that "COVID-19 strains physically infect and can stay alive on surfaces for extended periods" and government shut-down orders required the insured to cease operations. (*Id.* at pp. 692, 693–694.)

Although *Inns* might thus seem to undermine if not entirely foreclose Best Rest's case, we limited our holding by positing in dicta a "hypothetical scenario" where "an invisible airborne agent would cause a policyholder to suspend operations because of direct physical damage to property." (*Inns, supra,* 71 Cal.App.5th at p. 704.) We thus left open the possibility that if a business " '*which could have otherwise been operating*' " was required to

2

" 'shut down because of the presence of the virus within the facility,' " then " 'perhaps' " the business " 'could successfully' " demonstrate " 'that the virus created physical loss or damage in the same way some chemical contaminant might have.' " (*Id.* at pp. 704–705, italics added.)

Best Rest contends its case "falls directly within the exception discussed by this [c]ourt in [*Inns*]." Supported by an infectious disease expert's declaration, Best Rest maintains that virus-infected droplets landed on surfaces in the hotel, and the presence of these droplets—known as fomites—caused physical loss or damage, rendering the property incapable of safely providing lodging.

As we explain, Best Rest's argument fails because the record contains no evidence creating a triable issue that the hotel "could have otherwise been operating" but for the presence of COVID-19 on the premises. Indeed, Best Rest's own evidence established the exact opposite was true. Its vice president and operating partner, Evans Salem, testified that the phones were "ringing off the hook[ ]" with cancellations—not because of COVID-19 *in* the hotel, but because of government shut down orders and travel restrictions that shuttered tourism  The hotel's general manager, Yasmine Zaya, similarly testified in deposition:

> "Q: So you had said that there were—there was a reduction in people traveling.  [¶]  So other than a reduction in people traveling, was there any reason why you could not rent out the rooms at the motel?
>
> "A:  No."

What we said in *Inns* is also true here—even if " 'a cleaning crew Lysol-ed every inch of the [hotel], it could still not' " rent out its rooms. (*Inns, supra,* 71 Cal.App.5th at p. 704.)  Accordingly, we affirm summary judgment in

3

Sequoia's favor because there is no evidence creating a triable issue that COVID-19 in the hotel caused the claimed lost income.

FACTUAL AND PROCEDURAL BACKGROUND

Best Rest owns and operates a 126-room Holiday Inn Express franchise in San Diego. Its business comes mostly from tourists who stay at the hotel while visiting Sea World, the San Diego Zoo, Safari Park, Legoland, and other local attractions. Families attending graduation ceremonies at the nearby Marine Corps Recruit Depot, as well as cruise ship passengers and people attending events at the San Diego Convention Center, also account for a significant number of its guests.

In 2019, Best Rest purchased a commercial multiperil insurance policy (the Policy) from Sequoia. It included "Business Income (and Extra Expense) Coverage." Sequoia agreed to "pay for the actual loss of Business Income" that Best Rest sustained "due to the necessary 'suspension' " of its operations "caused by direct physical loss of or damage to" the insured property from a covered cause of loss. (See, e.g., *Shaw Mort. Corp. v. Peerless Ins. Co.* (S.D.Cal. 2009) 615 F.Supp.2d 1172, 1174 [coverage for loss of business income during restoration where fire destroyed store].)

The Policy also included a "Coverage Form Extender." Among other things, it provided that Sequoia would pay for the actual loss of business income that Best Rest sustained due to the necessary suspension of its operations caused by "direct physical loss or damage to 'dependent property.' " "Dependent Property" is defined to include "property operated by

4

others whom you depend on to: [¶] . . . [¶] Attract customers to your business . . . ."[1]

Before March 2020, Best Rest enjoyed an average occupancy rate of about 94 percent. In March 2020, however, it "experienced a wave of reservation cancellations." Customers explained "that they were cancelling because of the coronavirus and because major tourist attractions and businesses in the San Diego area were closed, or were in the process of closing." More cancellations occurred because the Marine Corps suspended public graduation ceremonies. Conventions were also cancelled. Salem testified that travel reductions had a "[m]assive impact" on the business. In a declaration, he added:

> "As a result of the closure of these businesses, and the cancellations of conventions and graduations due to coronavirus, in total, business dropped off at Best Rest by about 90% during the second half of March 2020."

The hotel nevertheless continued to operate during the pandemic, albeit at a much reduced occupancy. Plexiglass barriers and sanitation stations were installed. Management posted signs encouraging social distancing.

But despite these precautions, several employees and guests became infected with COVID-19. One guest was taken from the room on a stretcher by men in hazmat suits. Hotel personnel "intensively sanitized" those areas and could not use them until they were "safe to enter."

---

[1] For example, a raw material supplier's factory might be destroyed by fire, compelling the insured to curtail operations for lack of these goods. (See Tarr, *Where Have All the Customers Gone-Business Interruption Coverage for Off-Premises Events* (2001) 30 Brief 21, 28.)

Additionally, due to the suspected presence of COVID-19 and/or risk of transmission, the hotel closed its gym and swimming pool, and changed the breakfast area to take-out only.  Significantly, however, in deposition testimony Salem conceded that the hotel did not shut down any guest rooms.

In March 2020, Best Rest submitted a claim to Sequoia under the business income coverage.  A few weeks later, Sequoia denied coverage on the grounds that "there was no direct physical damage" to the covered property and no "direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss."

In May 2020 (more than a year before our *Inns* decision), Best Rest sued Sequoia for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.  In a section of the complaint entitled "The Loss," excerpts of which are quoted below, Best Rest alleged that its lost business income was the result of (1) state government shut down orders, (2) federal border closings, and (3) community-wide COVID-19 infections, all combining to cause massive reductions in tourism and travel. Key allegations in the complaint included:

- "Because tourism and non-essential business travel were suspended pursuant to Governor Newsom's Executive Order, Best Rest suffered a dramatic surge of reservation cancellations and a disastrous evaporation of business income."

- In March 2020, the federal government closed its border with Mexico and Canada to any nonessential travel.  "These closures further exacerbated damage to [Best Rest's] business."

- "As a result of the Emergency Order, Executive Order, Local Order, and community infection of COVID-19 in and around Old Town San Diego, the tourist-oriented businesses adjacent to the Insured Property, as well as regional theme parks and other facilities that attract visitors to the area, have been closed.  Large conventions like Comic-Con 2020, university graduations, and other large community gatherings on which Best Rest has historically relied to fill vacancies have been

6

canceled. . . . *[T]he combined impacts of these and other actions taken to comply with the Emergency Order, Executive Order, and Local Order, as well as community infection of COVID-19 adjacent to the subject property, have caused a precipitous decline in business income.*"  (Italics added.)[2]

Sequoia moved for summary judgment in April 2021.  The timing is important because this was several months *before* our opinion in *Inns*.  As a result, although causation is addressed in the motion, it was not the focal point.

Relying on *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766 (*MRI Healthcare*), Sequoia asserted that "direct physical loss or damage requires a 'distinct, demonstrable, physical alteration of the property.' "  Colorfully stating that COVID-19 " 'harms people, not property,' " Sequoia maintained there was no coverage as a matter of law.  Alternatively, Sequoia maintained "there is no nexus between Best Rest's losses and the alleged presence of COVID-19 at the motel."  It asserted, "Other than the fact that there are fewer people traveling, there is no reason Best Rest could not rent its motel rooms."

Opposing the motion, Best Rest submitted a declaration from a board-certified infectious disease specialist, Erik Dubberke.  He explained that COVID-19 is transmitted by "respiratory droplets" that can "remain viable and infectious" on surfaces for "days."  Accordingly, when a person "touches"

___

[2]     In its opening brief, Best Rest claims that it "asserted in its complaint . . . that at least *part* of its facilities were closed as a result of the COVID-19's presence on its insured property."  But the only citation given to support that assertion is not to the complaint, but rather to Zaya's declaration submitted in opposition to the summary judgment motion.

7

an infected surface, "fomite transmission" can occur.[3]  Dubberke opined that COVID-19 causes "direct physical damage to surfaces and air by making them infectious."

Best Rest also emphasized the absence of a "virus exclusion" in its Sequoia policy.  It maintained that " 'direct physical loss or damage to property' encompasses 'loss of use.' "[4]  On the issue of causation, Best Rest claimed the evidence created a triable issue that "the coronavirus itself, as well as orders relating to the presence of the" virus "independently" caused its business losses.  It distinguished *MRI Healthcare* on numerous grounds, including that it involved a mechanical failure in medical equipment, not an "external force" like a virus.  In sum, Best Rest asserted that if Sequoia intended "direct physical loss of or damage to" property to mean structural or tangible alteration, it should have plainly said so.[5]

After conducting a hearing, the superior court granted summary judgment in Sequoia's favor.  Citing *MRI Healthcare*, the court concluded

[3]    A fomite is an object that "may be contaminated with infectious agents (such as bacteria or viruses) and serve in their transmission."  (Merriam Webster Dictionary <https://www.merriam-webster.com/dictionary/fomite> [as of Feb. 24, 2023] archived at <https://permacc/4QAE-2RFQ>.)

[4]    In *Inns*, we held that " 'direct physical loss' of property" does not include loss of use.  (*Inns*, *supra*, 71 Cal.App.5th at p. 705, fn. 18.)  But we left open the possibility that in some other factual scenarios, direct physical damage to property could result in a covered loss of use.  (*Id*. at pp. 704–705.)

[5]    In the trial court, Best Rest also claimed that its lost income as well as expenses it incurred to avoid or minimize the suspension of business operations were also covered losses under the Civil Authority provisions in the policy.  The trial court rejected that argument.  As Sequoia points out, Best Rest has not challenged that aspect of the ruling in its opening brief. Therefore, the point is deemed abandoned.  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538.)

8

that as a matter of law, "there was no direct physical damage or loss of property" that would trigger coverage. About two weeks later, this court issued its opinion in *Inns*.

## DISCUSSION

This case is strikingly similar to *Inns*. Both involve a lodging facility's claim for business losses as a result of the COVID-19 pandemic. (See *Inns*, *supra*, 71 Cal.App.5th at pp. 692–693.) In deciding that case, we assumed that " 'at some point, a person infected with COVID-19 was known to have been present at one or more of [the insured's] lodging facilities.' " (*Id.* at p. 699.) As here, the insurance policy covered actual loss of business income "caused by direct physical loss of or damage to [covered] property at [the] premises . . . caused by or result[ing] from any [c]overed [c]ause of [l]oss." (*Id.* at p. 694, italics omitted.) The policy in *Inns* did not define " 'direct,' " " 'physical,' " " 'loss,' " or " 'damage.' " (*Id.* at p. 699, fn. 13.) Neither does Best Rest's.

In *Inns*, the insured argued that even though COVID-19 did not physically alter the structure of property, it gave rise to " 'physical damage' " by rendering it uninhabitable and unavailable for its intended use. (*Inns*, *supra*, 71 Cal.App.5th at p. 701.) We acknowledged there were analogous cases involving noxious odors, gases, and vapors that might support that proposition. (*Id.* at pp. 701–702, 703.)[6]

---

[6] For example: Permeating or pervasive unpleasant odors such as " 'locker room' " smell (*Essex Ins. Co. v. BloomSouth Flooring Corp.* (1st Cir. 2009) 562 F.3d 399, 406); cat urine (*Mellin v. N. Sec. Ins. Co., Inc.* (N.H. 2015) 115 A.3d 799, 801); toxic gas (*TRAVCO Ins. Co. v. Ward* (E.D.Va. 2010) 715 F.Supp.2d 699, 708 [physical damage to the property is not necessary where the building "has been rendered unusable by physical forces"]); and gasoline

Indeed, more than 60 years ago, an insurer raised the same argument that Sequoia advocates in this appeal—that coverage is limited to instances in which tangible injury to the physical structure itself has occurred. (See *Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239, 249 (*Hughes*).) *Hughes* rejected the argument, stating:

> "Common sense requires that a policy should not be . . . interpreted" in such a way that an insured home "might be rendered completely useless to its owners, [yet] [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected." (*Ibid*.)[7]

Nevertheless, *Inns* determined there was no coverage for direct physical damage because the insured did not allege (and could not truthfully amend the complaint to allege) that the presence of COVID-19 on its premises *caused* the facility to be uninhabitable. (*Inns*, *supra*, 71 Cal.App.5th at p. 703.) Government closure orders were issued because the virus was present throughout the state—not because of any particular presence on the hotel's premises. (*Ibid*.) The insured in *Inns* alleged it ceased operations " 'as a direct and proximate result' " of the government shut-down orders; it did not allege the particular presence of virus on its premises proximately caused its closure. (*Ibid*.) Thus, there was a fatal "lack of causal connection between the alleged physical presence of the virus on [the insured's] premises and the suspension of [its] operations . . . ."

---

vapors saturating a building, making it uninhabitable (*Western Fire Ins. Co. v. First Presbyterian Church* (1968) 165 Colo. 34, 39).

[7] *Inns* characterized *Hughes* as the "central relevant California opinion" on this point. (*Inns*, *supra*, 71 Cal.App.5th at p. 701.) *Hughes* was disapproved on other grounds in *Sabella v. Wisler* (1963) 59 Cal.2d 21, 34.

(*Id*. at p. 704.) The insured's business " 'would have . . . remained shut regardless of whether the virus was present in its facilities.' " (*Id*. at p. 705.)

Inns also rejected the insured's argument that " 'direct physical loss of' " property occurs merely because the insured property cannot function as intended. (*Inns, supra*, 71 Cal.App.5th at p. 705.) We explained that argument "collapses coverage for 'direct physical loss' into 'loss of use' coverage" and was unsupported by the policy language as a whole as well as case law. (*Ibid*.) We followed Couch's treatise[8] as well as "numerous courts [that] have observed the words 'direct' and 'physical' preclude the argument that coverage arises in a situation where the loss incurred by the policyholder stems solely from an inability to use the physical premises to generate income, without any other physical impact to the property." (*Inns,* at p. 706.) *Inns* explained that "although the dictionary definition of 'loss' could encompass the mere loss of use of real property, the surrounding context of the word 'loss' in the [p]olicy unambiguously indicates that 'direct physical loss of' property cannot reasonably be interpreted to have that meaning." (*Id*. at p. 705, fn. 18.) Citing Couch, we held that to trigger coverage for direct physical loss, there must be a " 'distinct, demonstrable, physical alteration of the property.' "[9] (*Inns,* at p. 706.)

---

[8]  10A Couch on Insurance (3d ed. 2016) § 148:46 (Couch).

[9]  An article published after *Inns* was submitted for decision has questioned the validity of Couch's summary. (Lewis, et al., *Couch's "Physical Alteration" Fallacy:  Its Origins and Consequences* (2021) 56 Tort, Trial & Ins. Prac. L.J. 621, 624.)  Based in part on that article, amicus curiae San Manuel Band of Indians asks that we "reject the *Couch* standard as an incorrect statement of law."  It is a fascinating question, but we decline to consider it because, as we will explain, Best Rest's case fails for a different reason—lack of causation.

11

We further noted that even where other courts have found that "'contamination of a structure' that seriously impairs or destroys its function may qualify as direct physical loss"—they decline to find coverage for "short-lived" contamination. (*Inns*, *supra*, 71 Cal.App.5th at p. 703 and fn. 17.) The paradigm example may be *Mama Jo's Inc. v. Sparta Ins. Co.* (11th Cir. 2020) 823 Fed. Appx. 868. There, a restaurant sought lost income coverage when dust and debris from nearby road construction decreased customer traffic. (*Id.* at p. 871.) Rejecting the claim, the Eleventh Circuit stated, "an item or structure that merely needs to be cleaned has not suffer a 'loss' which is both 'direct' and 'physical.'" (*Id.* at p. 879; see also *Kim-Chee LLC v. Phila. Indem. Ins. Co.* (W.D.N.Y. 2021) 535 F.Supp.3d 152, 160–161 [collecting similar cases].)[10]

Nevertheless, *Inns* left one coverage door slightly ajar. Looking to the cases involving noxious gases and odors, we observed in dicta, "[I]t could be possible, in a hypothetical scenario, that an invisible airborne agent would cause a policyholder to suspend operations because of direct physical damage to property." (*Inns*, *supra*, 71 Cal.App.5th at p. 704.) We posed the example of "'a business—which could have otherwise been operating—[but] had to shut down because of the presence of the virus within the facility.'" (*Ibid.*) For instance, "'a restaurant might need to close for a week if someone in its

---

[10] Applying this reasoning here, if the virus can be quickly cleaned up with commonly available disinfectants, and there is no evidence that surfaces where fomites once were remain dangerous, it follows there is no physical loss of or damage to property. (See *Verveine Corp. v. Strathmore Ins. Co.* (Mass. 2022) 184 N.E.3d 1266, 1276 ["Evanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property"].)

12

kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period.' " (*Id*. at pp. 704–705.)

Now on appeal, Best Rest has reconfigured its arguments to embrace the *Inns* dicta. It contends that its case "directly embodies the principles applicable to the hypothetical situation envisioned by this [c]ourt in [*Inns*]." It maintains there is a triable issue that "it suffered various COVID-19 contaminations, which necessitated the closure of hotel facilities and the loss of hotel rooms for substantial periods of time." The hotel insists it submitted evidence to support a finding that its vacant rooms were not "because of any civil order, or as a precaution" but instead "because COVID-19 was *on the premises*." (Underscore omitted.)

Setting aside any ramifications from the shift in legal theory, the evidence simply does not support Best Rest's assertions. Our analysis logically starts with Governor Newsom's Executive Order No. N-33-20, colloquially referred to as the "stay-at-home order" issued in March 2020. It directed California residents to "immediately heed" public health directives, including instructions that individuals "stay home" except as needed for "critical infrastructure sectors." Best Rest was not a target of a specific closure order. Almost the entire state economy was ordered to shut down.

Of course, on summary judgment we credit Best Rest's evidence that the virus was present in or on the insured premises at some point. (See *Fajardo v. Dailey* (2022) 85 Cal.App.5th 221, 226.) We also accept as true Dubberke's opinion that COVID-19 has physical properties and when virus particles are expelled, objects they land on and the surrounding air is rendered temporarily unsafe for human habitation.

But the difficulty for Best Rest is that without evidence creating a triable issue on causation, none of that matters. The dispositive issue in this

13

case is not whether there was COVID-19 in the hotel, or whether fomites are a form of physical damage, but instead is whether the presence of COVID-19 in or on the insured property *caused* the hotel's loss of income.

This nexus is required because the policy covers "*direct* physical loss of or damage to" certain property. When used here—as an adjective—"direct" commonly means "stemming immediately from a source," or as "characterized by close logical, causal, or consequential relationship."[11] (See *Huntington Ingalls Industries, Inc. v. Ace American Ins. Co.* (Vt. Sup.Ct. 2022) 2022 VT 45, at ¶33 ["[D]eprivation of property must be causally linked to a physical event. The plain meaning of 'direct physical loss' requires an 'explicit nexus between the purported loss and the physical condition of the insured property.' "].)

In deposition, Salem testified hotel reservations were cancelled because would-be guests "can't travel" and because San Diego attractions were closed—not because of the virus's presence in hotel property:

> "Q: So you said that in March of 2020, at the time you made this insurance claim, you had already seen a reduction in tourists, is that right?
>
> "A: Definitely, yes.
>
> "Q: What did you observe in that regard?
>
> "A: Phones are ringing off the hook[ ], people trying to cancel their stay[ ], because they can't travel or, you know, all the attractions are around us and other properties, dependent properties are closed." [¶] . . . [¶]
>
> "Q: I see. So if graduations aren't happening, then you are not going to have those people staying at the motel; correct?

---

11    <Https://www.merriam-webster.com/dictionary/direct?src=search-dict-box> [as of Feb. 24, 2023] archived at <https://permacc//9ZEY-NZB7>.

14

"A: Yes.

"Q: And if people aren't traveling for conventions, you don't have those people staying at the motel; right?

"A: Yes.

"Q: And if people aren't going to the tourist attractions, you are not going to have people staying at the motel; right?

"A: Yes."

He further testified that the hotel lost "many reservations on the books for conventions in March, April, May, June, July and August" but they were "canceled because of coronavirus . . . they could not hold those events." Best Rest also lost "30 to 40 percent" of its occupancy when the Marine Corps suspended public graduation ceremonies. Salem explained that as a result, the hotel "had to cancel tons of reservations," creating a "huge" loss.

Similarly, general manager Zaya testified that a "major" reduction in tourism "[b]ecause of the pandemic" had "a direct impact on [the hotel's] business." She also explained that one guest had apparently become infected while at the hotel. That room was sanitized and cordoned off for 10 days. But even then, Best Rest did not lose any guest business. A fair reading of Zaya's deposition testimony is that people were not staying at the hotel because "[p]eople are afraid to travel" and "a lot of corporate conventions were cancelled," not because "of anything specific" to the Best Rest property. When some employees contracted COVID-19, the hotel redoubled its sanitizing efforts. Yet still, it did not close any portion of the hotel as a result of an employee contracting the virus. To the contrary, Zaya conceded that "other than a reduction in people traveling," there was *no other reason* the hotel could not rent out its rooms:

15

"Q: So other than a reduction in people traveling, was there any reason why you could not rent out the rooms at the motel?

"A: No."[12]

Moreover, although Best Rest closed one floor of the hotel, that was for the convenience of hotel staff. As she explained:

"[F]or example, why do I have to vacuum a hallway that has 25 rooms if I rented one room in that building or that floor? So I put them on one floor instead of scattering into three."

Zaya further conceded that the hotel always had rooms available for customers wanting to stay there:

"Q: But you always had rooms available to rent if you had customers willing to occupy those rooms?

"A: Absolutely."

As we explained in *Inns*, even if Best Rest had eradicated all traces of COVID-19 from its premises, it still would have suffered the same lost income. Because there is no evidence creating a triable issue that Best Rest's claimed business loss was caused by the presence of the virus in or on the insured property, Sequoia was entitled to summary judgment.[13]

---

[12] Salem similarly testified that Best Rest did not shut down any guestrooms in 2020.

[13] Not having the benefit of our opinion in *Inns*, the trial court granted summary judgment on different grounds—finding there was no direct physical loss of or damage to property. Nevertheless, we may affirm an order granting summary judgment if it is correct on any of the grounds asserted in the trial court regardless of the trial court's stated reasons. (*Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 637.)

Our disposition makes it unnecessary to address Best Rest's contention that COVID-19 in the hotel constitutes damage to property, or alters

16

In urging the opposite result, Best Rest insists it presented evidence that "the presence of the coronavirus compelled [it] to close its breakfast seating area" and it loss the "use of hotel rooms . . . for a period of over a week." But to support those assertions, it does not cite any deposition testimony. Rather, it relies on lawyer-prepared declarations signed by Salem and Zaya.

These declarations are very carefully written. For example, Zaya's declaration states that after a guest was removed from the hotel by ambulance, "we were unable to rent the room to guests and were physically unable to use the room for any purpose." We accept this as true. But it's a half-truth. Left unsaid is that Best Rest could not have suffered any lost income as a result because the hotel had plenty of other vacant rooms. The problem was not too few rooms, but no customers. In any event, Zaya's deposition testimony—that the hotel "always had rooms available to rent if [it] had customers willing to occupy those rooms"—contradicts the suggestion of lost occupancy income in her declaration—and therefore does not create a triable issue of fact. A party cannot create a triable issue of fact by providing

property, within the meaning of the policy. Likewise, it is unnecessary to address several other issues raised by the parties, including (1) whether the trial court correctly relied on *MRI Healthcare* in determining that no covered loss occurred; (2) the effect (if any) on the lack of a virus exclusion in the hotel's policy; or (3) whether coverage is precluded under the policy's "loss of use" exclusion. As amicus curiae United Policyholders points out, appellate courts generally will not address issues whose resolution is unnecessary to disposition of the appeal.

Finally, because Best Rest's breach of contract claim fails, so necessarily must its claim for breach of the implied covenant of good faith and fair dealing. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.) For this reason, we have not addressed the parties' arguments regarding the handling of the claim.

a declaration that contradicts its prior deposition testimony. (See *Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12.)

Best Rest's brief is also very carefully written. The hotel asserts, "[T]he only reason that [its] facilities were shut was because the virus was present." The hotel cites a portion of Zaya's declaration stating, "The pandemic also caused a number of rooms to be placed 'out of order' and remain unoccupied for extended periods of time." In its brief, the hotel asserts that as a result of the virus's presence in those rooms, Best Rest was "precluded" from "renting out its rooms after COVID-19 infected individuals stayed in them" and also "prohibited Best Rest from using certain public areas of the hotel."

We accept all this as being true. The problem is that it ignores the real issue. The question is whether there is evidence creating a triable issue that cordoned off guest rooms and closing the gym and other public areas *caused* any loss of business income. The deposition testimony, which we quoted above, clearly and unequivocally states it did not.

Turning to its expert's declaration, Best Rest also contends the evidence created a triable issue that COVID-19 "altered" its property. It points to the virologist's opinion that COVID-19 infected persons "*will cause direct physical damage* to surfaces and air" by occupying indoor areas and touching surfaces. (Italics added.)

But this argument suffers from the same problem. We accept as true, for purposes of reviewing summary judgment, that COVID-19 fomites were in the hotel, and for at least some period of time rendered the hotel or parts of it uninhabitable. To trigger coverage, the damage or loss must be "direct," and as explained, there is no evidence creating a triable issue that fomites—as

18

distinguished from massive reductions in tourism—caused any of Best Rest's lost income.[14]

For similar reasons, we are not persuaded by Best Rest's reliance on *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Insurance Co.* (2022) 81 Cal.App.5th 96 and *Shusa, Inc. v. Century-National Insurance Company* (2022) 87 Cal.App.5th 250. Each of those appeals arose from a judgment of dismissal after a demurrer was sustained without leave to amend. The procedural setting is important because under the applicable standard of review, both the trial and appellate courts were required to accept the well-pleaded allegations as true. In *Marina Pacific*, the plaintiff alleged that COVID-19 bonded or adhered to objects in the hotel which "required the closure or suspension of [its] operations." (*Id*. at pp. 101–102.) Similarly, in *Shusa*, the plaintiff (restaurant) alleged it suffered physical loss or damage to its dining rooms and other property " 'caused by the actual presence of virus droplets in the air and on the surfaces in the vicinity of and in [its] restaurant.' " (*Shusa*, at p. 104.) Given those allegations, deemed true on demurrer, the appellate courts found the required nexus between the virus and the lost income adequately alleged for purposes of withstanding a demurrer. In sharp contrast here, Best Rest's appeal from summary judgment requires admissible evidence. We do not assume the truth of the allegations in the complaint. (Code. Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851; *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 506.)

---

14    Additionally, the virologist's assertion that COVID-19 constitutes "direct physical damage" is an inadmissible legal conclusion. In the trial court, Sequoia properly objected on these grounds.

For many of these same reasons, we also reject Best Rest's related argument that it established a triable issue under the "Dependent Properties" provisions in its Sequoia policy. It provides coverage "for the actual loss of Business Income" that Best Rest sustained "due to the necessary suspension of [its] operations" where the suspension is "caused by direct physical loss of or damage to 'dependent property.' " Best Rest contends that when local tourist attractions such as Sea World and the San Diego Zoo (i.e. dependent properties) closed during the pandemic, its hotel business "evaporated." But even assuming that tourist attractions such as Sea World and the San Diego Zoo are "dependent properties," there is no evidence creating a triable issue that those businesses closed due to their own "direct physical loss of or damage"—as distinguished from government shut down orders and the lack of sufficient tourists.[15]

---

[15] We granted leave to permit the filing of several amicus curiae briefs. Generally, they were quite helpful as they approached the issues from different angles. But one urged us to affirm because to impose "this type of risk" on insurers would cost the industry hundreds of billions of dollars per month and "distort the insurance mechanism." The same brief also went outside the record to inform us that Best Rest was the beneficiary of nearly $700,000 in government relief stemming from the pandemic. These types or arguments play no role in our decision. We reiterate the comments of the Supreme Court in *Aerojet-General Corporation v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, rejecting a similar doomsday argument by the insurance industry: "[T]he pertinent policies provide what they provide. [The policyholder] and the insurers were generally free to contract as they pleased. They evidently did so. They thereby established what was 'fair' and 'just' inter se. We may not rewrite what they themselves wrote. We must certainly resist the temptation to do so here simply in order to adjust for chance—for the benefits it has bestowed on one party without merit and for the burdens it has laid on others without desert." (*Id.* at p. 75.)

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.